860 A.2d 102

**COMMONWEALTH of Pennsylvania, Appellee**

**v.**

**Jose DeJESUS, Appellant.**

Supreme Court of Pennsylvania.

Argued Oct. 22, 2002.

Decided Oct. 21, 2004.

304

Samuel C. Stretton, West Chester, for Jose DeJesus, appellant.

Hugh J. Burns, Philadelphia, Amy Zapp, Harrisburg, Lorie K. Dakession, for Com. of PA., appellee.

BEFORE: ZAPPALA, C.J., CAPPY, CASTILLE, NIGRO, NEWMAN, SAYLOR and EAKIN, JJ.

## *OPINION*

Justice CASTILLE.

This is a direct appeal from a sentence of death imposed by the Philadelphia County Court of Common Pleas. Following a capital jury trial, which commenced on September 10, 1999, appellant was convicted of first-degree murder,[1] carrying firearms on a public street,[2] and possession of an instrument of crime.[3] At the penalty phase, the jury found two aggravating circumstances and two mitigating circumstances.[4] The jury

1. 18 Pa.C.S. § 2502.

2. 18 Pa.C.S. § 6108.

3. 18 Pa.C.S. § 907.

4. The aggravating circumstances were that appellant had a significant history of felony convictions involving the use or threat of violence to the person, 42 Pa.C.S. § 9711(d)(9), and that appellant was convicted of another murder, committed either before or at the time of the offense at issue, *id.* § 9711(d)(11). The two mitigating circumstances were appel-

found that the aggravating circumstances outweighed the mitigating circumstances, and accordingly, imposed a sentence of death for appellant's first-degree murder conviction. On October 28, 1999, the trial court formally imposed the death sentence and, in addition, imposed two consecutive sentences of one to two years' incarceration for appellant's remaining convictions. Appellant did not file post-sentence motions. This appeal followed.[5] For the reasons set forth below, we affirm appellant's convictions, but reverse the sentence of death and remand the matter for a new penalty hearing.

We begin, as we do in all death penalty direct appeals, by independently reviewing the evidence to ensure that it is sufficient to support the first-degree murder conviction. *Commonwealth v. Zettlemoyer*, 500 Pa. 16, 454 A.2d 937, 942 n. 3 (1982), *cert. denied*, 461 U.S. 970, 103 S.Ct. 2444, 77 L.Ed.2d 1327 (1983). When reviewing the sufficiency of the evidence, this Court must determine whether the evidence at trial, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, are sufficient to establish all elements of the offense beyond a reasonable doubt. *Commonwealth v. Bridges*, 563 Pa. 1, 757 A.2d 859, 864 (2000). A person is guilty of first-degree murder where the Commonwealth proves that (1) a human being was unlawfully killed; (2) the person accused is responsible for the killing; and (3) the accused acted with specific intent to kill. 18 Pa.C.S. § 2502(d); *Commonwealth v. Spotz*, 563 Pa. 269, 759 A.2d 1280, 1283 (2000). An intentional killing is a "[k]illing by means of poison, or by lying in wait, or any other kind of willful, deliberate and premeditated killing." 18 Pa.C.S. § 2502(d). Specific intent to kill can be inferred from the use of a deadly weapon upon a vital part of the victim's body. *Commonwealth v. Fletcher*, 561 Pa. 266, 750 A.2d 261, 267 (2000).

lant's age at the time of the crime, *id.* § 9711(e)(4), and any other evidence of mitigation concerning the character and record of appellant, *id.* § 9711(e)(8).

5. Pursuant to 42 Pa.C.S. § 9711(h), this Court has automatic jurisdiction to review the court's judgment of a sentence of death.

The evidence adduced at trial established that, in the early morning hours of August 24, 1997, appellant approached David Sims near the corner of Randolph Street and Allegheny Avenue in Philadelphia. As the two men walked together, appellant heatedly questioned Sims about a stolen gun. Sims replied, "I'm sorry, I'm sorry." Appellant nevertheless proceeded to punch Sims several times. As Sims recoiled from the blows, appellant pulled a weapon, possibly a "TEC–9" handgun, from underneath his shirt and shouted, "I'll show you what sorry is." Sims pleaded, "no please, please don't, just please don't" as appellant aimed the weapon and pulled the trigger. But appellant's first attempt to fire the weapon failed—perhaps because he had not deactivated the safety mechanism. On a second attempt, however, appellant fired several rounds at Sims as he attempted to flee, fatally wounding him. The medical examiner determined that the cause of death was multiple gunshot wounds; Sims had sustained eleven shots to the back, hip, thigh, and arms.

Three eyewitnesses testified at appellant's trial that they saw appellant, or someone resembling appellant, commit the murder. Luis Castillo, who lived with his family on Randolph Street, testified that he saw the shooting from his second-floor bedroom window, but did not recognize the shooter, whom he described as a "Puerto Rican male." [6] N.T. 9/10/99, at 38–48. He recalled that the shooter fired what sounded like six or seven shots with a "small black machine gun." *Id.* at 45.

The other eyewitnesses, Luis' brother, Antonio, and Antonio's then-girlfriend, Jennifer Zlatnik, were outside in front of the Castillo home at the time of the shooting. Antonio testified that he saw appellant, whom he recognized from the neighborhood, fire multiple shots at Sims after a brief argument and a physical altercation. Zlatnik likewise testified that she saw appellant shoot Sims multiple times with "some type of machine gun." N.T. 9/10/99, at 67–83. She further testified that appellant looked at her "real hard" as he walked away from the scene of the shooting. *Id.* at 73. In a statement to police on the night of the murder, she described the shooter as

6. Appellant is Puerto Rican.

a nineteen- to twenty-year-old, light complexioned, Hispanic male, with a nose-ring, gold medallion, and a baseball cap. Several months later, police presented Antonio, and later, Zlatnik, with a photographic array which had been compiled based upon Zlatnik's crime-scene description of the shooter. Both witnesses identified appellant's photograph as that of the shooter.

This evidence, and all reasonable inferences derived therefrom, when viewed in the light most favorable to the Commonwealth as verdict winner, supports appellant's first-degree murder conviction. Sims was unlawfully killed, as there is nothing on this record to support that the use of deadly force against him was legally justified. The eyewitness testimony identified appellant as the person who deliberately shot the victim. The evidence that appellant stated, "I'll show you what sorry is," as he drew his weapon, unsuccessfully attempted to fire it and then, after another attempt, shot Sims multiple times, establishes that the killing was deliberate. Finally, the fact that appellant shot the victim in vital body parts independently warranted the jury finding of a specific intent to kill.

Appellant claims, however, that the evidence was "insufficient" to support the convictions because the only evidence linking him to the murder is what he deems the "highly inconsistent" testimony of Antonio Castillo and Zlatnik. Appellant contends that the witnesses' testimony is "tainted" by the fact that they failed to implicate appellant in the murder until months later after they themselves had been charged with serious crimes. Appellant further argues that numerous inconsistencies as to whether they witnessed the murder while in their car, on the steps, or in the house, rendered their testimony unreliable.

Appellant's claim challenges the weight, not the sufficiency, of the evidence. The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses. *Commonwealth v. Johnson,* 542 Pa. 384, 668

A.2d 97, 101 (1995). Questions concerning inconsistent testimony and improper motive go to the credibility of the witnesses. *Commonwealth v. Boxley*, 575 Pa. 611, 838 A.2d 608, 612 (2003). This Court cannot substitute its judgment for that of the jury on issues of credibility. *Commonwealth v. Pronkoskie*, 498 Pa. 245, 445 A.2d 1203, 1206 (1982).

■ Appellant cites this Court's decision in *Commonwealth v. Farquharson*, 467 Pa. 50, 354 A.2d 545 (1976), for the proposition that a guilty verdict will not stand where a witness's testimony is so contradictory as to be incapable of reasonable reconciliation. The *Farquharson* Court indeed noted that "where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding." 354 A.2d at 550 (citing *Commonwealth v. Bennett*, 224 Pa.Super. 238, 303 A.2d 220 (1973)). But differences in the accounts of Antonio Castillo and Zlatnik that were contradictory are not sufficient to render their testimony mere conjecture or render it unreliable. While their testimony differed somewhat on the question of whether they were near a car or in front of the house when they saw the shooting, it was consistent as to the crucial events surrounding the shooting itself, *i.e.*, that appellant shot Sims multiple times after a brief argument and a physical altercation during which Sims had pleaded in vain for mercy. Moreover, their testimony was largely corroborated by Luis Castillo who also witnessed the murder but could not identify the killer. Thus, *Farquharson* is inapposite.

In reaching the verdict, the jury was free to weigh and reject the questions trial counsel raised concerning the eyewitnesses' credibility. As we will not disturb the jury's credibility determinations, this claim fails. *See Commonwealth v. Simmons*, 541 Pa. 211, 662 A.2d 621, 630 (1995) (assertion that inconsistencies rendered witness not credible meritless because credibility is for jury to determine).

Turning to appellant's other claims, we note initially that appellant raises several allegations of ineffective assistance of

trial counsel at both the guilt and the penalty phases of trial. This Court recently abrogated the procedural rule requiring new counsel to raise claims of previous counsel's ineffectiveness at the first opportunity when new counsel is appointed. *Commonwealth v. Grant*, 572 Pa. 48, 813 A.2d 726 (2002). In *Grant*, this Court announced a new general rule providing that a defendant "should wait to raise claims of ineffective assistance of trial counsel until collateral review." 813 A.2d at 738. We held that the new rule applies retroactively to "any other cases on direct appeal where the issue of ineffectiveness was properly raised and preserved." *Id.* Therefore, appellant's ineffectiveness claims are dismissed without prejudice to his right to raise those claims in a petition filed pursuant to the Post Conviction Relief Act ("PCRA"). 42 Pa.C.S. § 9541 *et seq.*[7,8]

Appellant also raises a claim that is a hybrid trial error/counsel ineffectiveness claim. Specifically, he argues that the "district attorney erred" when he elicited impermissible reputation evidence from Antonio Castillo and then improperly exploited the evidence during his closing argument. Appellant cites to the prosecutor's direct examination where he asked Castillo why he had not identified appellant's picture when police presented him with a photographic array on the night of the murder:

Q. [The Prosecutor:] When they showed you the pictures, did you see [appellant's] picture?

A. [Castillo:] Yeah, I did.

7. In *Commonwealth v. Bomar*, 573 Pa. 426, 826 A.2d 831 (2003), we recognized an exception to *Grant,* where the ineffectiveness claims were raised in the court below, a hearing was held at which trial counsel testified, and the trial court passed upon the claims. *Bomar* does not apply here because appellant did not raise his ineffectiveness claims below.

8. Appellant raises one claim of counsel ineffectiveness relating to the guilt-phase: whether trial counsel was ineffective for not presenting an alibi witness, Gregorio Torres, to demonstrate that appellant was not present at the time of the crime. In addition, appellant raises several penalty-phase claims involving ineffective assistance of counsel. In light of our grant of penalty-phase relief, these claims are moot. Finally, appellant raises two hybrid trial error/counsel ineffectiveness claims, which this Court discusses, *infra*.

Q. When you saw his picture, did you tell the police that's the man you saw?

A. No, I didn't.

Q. Why not?

A. 'Cause for one, you know, I didn't want to get involved. I knew about his reputation.

N.T. 9/13/99, at 13. Appellant further notes that during the guilt-phase closing arguments the prosecutor reminded the jury that Castillo had initially refused to identify appellant because he knew of his reputation: "Antonio knows [appellant] from the street. Antonio knows his reputation. Antonio did not want to get involved...." N.T. 9/14/99, at 75. No objection was raised to either of these events.

Appellant contends that Castillo's testimony, together with the prosecutor's closing argument, was highly prejudicial to him because it implied that he had a violent reputation. Appellant also argues that "there should have been an *in limine* hearing to determine whether the probative effect [of Castillo's testimony] outweighed any prejudicial aspect." Brief of Appellant at 42. Appellant further argues that his trial counsel should have objected to both references to appellant's "reputation." The Commonwealth counters that the prosecutor's emphasis on Castillo's fear of appellant was a fair response to defense counsel's suggestion in his opening and closing arguments that Castillo's belated identification of appellant was not credible. The Commonwealth also argues that counsel cannot be deemed ineffective because he made "tactical use" of Castillo's explanation of why he delayed in identifying appellant. Thus, counsel suggested that Castillo's belated identification of appellant occurred only after he was in trouble with police and because he was seeking to curry favor.

■ Appellant's failure to object to these references would ordinarily render this claim unreviewable as a claim of trial court error. Pa.R.A.P. 302(a). However, given that appellant filed his brief before this Court abrogated the direct capital appeal relaxed waiver doctrine in *Commonwealth v. Freeman*, 573 Pa. 532, 827 A.2d 385 (2003), we have discretion to reach

the waived claim. Nonetheless, we determine that this is the sort of claim that should not be subject to relaxed waiver review. In addition to the fact that appellant directly accuses counsel of ineffective assistance for failing to challenge the remarks, we note that this is a situation where defense counsel obviously focused on the testimony and attempted to make positive use of Antonio's failure to identify appellant on the night of the murder. In such an instance, it would be artificial and unrealistic to view the claim in isolation, without hearing counsel's explanation for his inaction. Accordingly, we dismiss this claim without prejudice to appellant's ability to pursue it under PCRA as a claim sounding in ineffective assistance of counsel, if he chooses to do so.

Appellant next claims that his right to due process was undermined when the prosecutor made several improper and inflammatory statements during his guilt phase closing argument.[9] In reviewing appellant's claim, we note that the prosecutor, like defense counsel, must be free to present his arguments with logical force and vigor. *Commonwealth v. Miles,* 545 Pa. 500, 681 A.2d 1295, 1300 (1996). A failure to grant relief in response to objections to the comments by a prosecutor will not constitute reversible error "unless the unavoidable effect of such comments would be to prejudice the jury, forming in their minds a fixed bias and hostility toward the defendant such that they could not weigh the evidence objectively and render a true verdict." *Commonwealth v. Copenhefer,* 553 Pa. 285, 719 A.2d 242, 257 (1998) (citations omitted). Appellant fails to satisfy his burden here.

Without citing to specific objectionable statements, appellant notes in a cursory manner several instances in which the prosecutor supposedly suggested that appellant had a burden to produce evidence. In the first such instance, appellant alleges that "the prosecutor told the jury that the defense had

9. Appellant concedes that counsel failed to object to some of the instances of alleged prosecutorial misconduct. Ordinarily, these subclaims would be waived. Nevertheless, we will review them under the relaxed waiver rule.

an obligation to present police officers" to testify. Brief of Appellant at 50–51.

Preliminarily, we note that appellant's defense rested primarily upon challenges to the eyewitnesses' credibility. As part of this effort, defense counsel questioned whether the police had presented Ms. Zlatnik with a photographic array on the night of the crime, which included appellant's photograph, but that she had failed to identify appellant. There was no evidence that this event occurred. Indeed, Ms. Zlatnik testified that she was not shown any photographs on the night of the murder. Nevertheless, in his summation, defense counsel suggested that the Commonwealth was obliged to produce witnesses to negate his bald contrary assertion:

If Jennifer Edwards [Zlatnik] really didn't look at photographs, **it's [the Commonwealth's] burden to present evidence about that, because we certainly have no way of proving it.** [The detectives who were] there the night of the shooting and could say Jennifer, for some reason, for some reason nobody can explain, for some reason common sense tells us does not exist, for some reason when Jennifer Edwards says, oh, I'd recognize that man if I saw him again, for some reason was not shown photographs. Their burden.

N.T. 9/14/99, at 44–45 (emphasis added). The prosecutor responded by noting the impracticability of producing every possible witness to negate defense speculation:

Now, when defense counsel tells us, and remember this, why didn't I call [those detectives] . . ., would you like to be here with me for the next three months? Because it's like the judge said. It's the answer that is evidence, not the questions.

. . . So if you want to be here for the rest of your life, I have to call every detective to testify. You know what the sergeant testified to. You know why he's here. Because he asked me, would you bring the sergeant here, and I brought him and he testified.

*Id.* at 66–67.

We do not believe that the prosecutor's comments here improperly suggested that appellant had a burden of proof or

production. In any event, to the extent that they were not a fair response to trial counsel, we note that the trial court sustained appellant's objection; instructed the jury to disregard the prosecutor's comments; and specifically instructed the jury that appellant was not required to present evidence or prove anything in his own defense. Thus, this claim fails. *See Bridges*, 757 A.2d at 883 ("[A] jury is presumed to have followed the instructions of the trial court.") (citation omitted); *Commonwealth v. Travaglia*, 541 Pa. 108, 661 A.2d 352, 361 (1995) ("The presumption in our law is that the jury follows instructions.").

In a similar vein, appellant alleges that the prosecutor acted improperly in "ask[ing] why the defense did not present the prison log as to who contacted Ms. Zlatnik at prison." Brief of Appellant at 51. In his closing argument, defense counsel had challenged the truthfulness of Zlatnik's testimony that she had not had any contact with Antonio Castillo while she was incarcerated.[10] The prosecutor countered that Castillo and Zlatnik had not communicated while she was incarcerated and that defense counsel's suggestion to the contrary was not supported by any evidence:

> When you talk about [Castillo] and Jennifer communicating, think of this. She was in jail. [Castillo] couldn't get a hold of her ... [Defense Counsel] could have, it was very simple, notified the prison and bring the log of who's allowed to write. He didn't bring that because he was on that list. Lord knows it would have been under your nose. He's on the list. He's on the letter list.... He wasn't. And that's why you didn't see them. But if you want to stay three months of a year with me, then I have to bring every piece of paper in the world. .

N.T. 9/14/99, at 72. Appellant immediately objected, and requested a side bar. The trial court denied the request for a side bar, but sustained the objection.

10. Zlatnik had been arrested on charges of robbery shortly after Sims' murder and she was incarcerated at the time she identified appellant's photograph.

The prosecutor did not claim that appellant was obliged to introduce the prison log. Rather, he simply argued that there was no evidence of record to support defense counsel's claim that Antonio had contacted Ms. Zlatnik while she was incarcerated. The prosecutor did not shift the burden of proof by noting that appellant could have impeached Ms. Zlatnik with any prison records that supported his defense theory, had such records existed. In any event, in addition to sustaining the objection, the trial court subsequently instructed the jury that the Commonwealth bore the burden of proof and that appellant was not required to produce any evidence. Since the jury is presumed to have followed the trial court's instructions, *see Bridges*, 757 A.2d at 883, this argument fails.

█ Appellant also avers that the prosecutor improperly criticized defense counsel's cross-examination of Zlatnik by referring to evidence not of record. Appellant cites the following portion of the prosecutor's closing argument in which he implied that defense counsel misled the jury about the content of Zlatnik's police statement:

> [T]hink of Jennifer's statement.... Remember how the defense attorney kept saying [to her], and you told them you could identify him, and I objected. I said, can you tell me the page, and he wouldn't tell me. And I asked the judge, could you tell him to tell me the page. He never did. Because it's three pages—and I know I'll be corrected if I'm wrong—she was never asked that question, if you saw him again could you identify him. Never asked that question. In fact, she said, I never saw him before. So now, in his closing he kept saying that. It's not here. It's not. He wants you to believe it. Just like the judge said, it's the answer, [not] the question....

N.T. 9/14/99, at 77–78.

Appellant does little to focus his argument. Rather, appellant simply contends that, because Zlatnik's police statement had not been formally introduced into evidence, the prosecutor should not have suggested that defense counsel's cross-examination was inconsistent with that statement. Zlatnik made

clear on cross-examination, however, that her police statement did indeed include the assertion that she could identify appellant if given the opportunity. Thus, we fail to see how the prosecutor's responsive remarks were improper, much less how they prejudiced the defense.[11]

Finally, appellant asserts that, on several occasions during closing argument, the prosecutor improperly conveyed his opinion regarding appellant's guilt. To support this argument, appellant lifts the prosecutor's statements out of context. Appellant first cites the following remark by the prosecutor: "This is a very simple case. [Appellant] did it. They saw him and Antonio knows him from the street, Antonio knows his reputation...." *Id.* at 75. Appellant then cites an instance in which the prosecutor urged the jury to find appellant guilty of first degree murder: "Don't let [appellant] get away with it." *Id.* at 79. And, finally, appellant argues that the prosecutor conveyed his personal opinion when he argued: "So look at [appellant], because there is no doubt, look at him because you are looking at something you don't see every day, a man who kills someone, butchers him for no good reason...." *Id.*

11. The prosecutor appears to have been referring to the following exchange during defense counsel's cross-examination of Zlatnik:

[Defense Counsel:] You said if you saw the man again, you would recognize him?

[Ms. Zlatnik:] Yes.

[The Prosecutor:] That's what page?

The Court: I don't know. That's just a question, and she's answered it. Yes.

[The Prosecutor:] Okay, judge.

The Court: He's not impeaching her with that.

[The Prosecutor:] Judge, I just wanted to see the question and the answer in here. That's all.

The Court: Tell him what page it is, please, and we can move on to something relevant. I mean, his asking the question about the page is not relevant, not your questions. Tell him the page.

[Defense:] Your honor, I have a couple other questions along that line.

The Court: That's fine. Tell [the prosecutor].

[Defense Counsel:] I'm not referring to a page.

[The Prosecutor:] Okay. Because I'm looking for it. I don't see it.

The Court: Good. All right.

N.T. 9/10/99, at 114–15.

A prosecutor should not offer his personal opinion as to the guilt of the accused. *See, e.g., Commonwealth v. Peterkin,* 538 Pa. 455, 649 A.2d 121, 128 (1994); *see also* ABA Standards for Criminal Justice 3–5.8(b) ("The prosecutor should not express his or her personal belief or opinion as to the truth or falsity of any testimony or evidence or the guilt of the defendant."). However, the prosecutor's remarks *sub judice* did not constitute impermissible personal opinions. Rather, viewed in context, the prosecutor was merely asking the jury to find appellant guilty based on the facts, which he accurately summarized. Further, the prosecutor did not imply that he had a special knowledge or innate ability to determine guilt based upon his position as prosecutor. Thus, the remarks did not jeopardize appellant's right to be tried solely on the basis of the evidence presented to the jury. *Cf. Commonwealth v. Toney,* 474 Pa. 243, 378 A.2d 310, 312 (1977) (prosecutor's remarks improper where not supported by any evidence).

Appellant next claims that the trial court erred in denying his motion to suppress the photographic arrays shown to Antonio Castillo and Zlatnik and "all evidence" related to their identifications of appellant's photograph. Appellant argues that the photographic arrays were unduly suggestive because he was the only "bald" person included in the selection, and thus, his likeness stood out among the other photographs. No relief is due.

A photographic identification is unduly suggestive if, under the totality of the circumstances, the identification procedure creates a substantial likelihood of misidentification. *Commonwealth v. Johnson,* 542 Pa. 384, 668 A.2d 97 (1995); *see also Commonwealth v. Natividad,* 565 Pa. 348, 773 A.2d 167 (2001). Our standard of review in addressing a challenge to a trial court's denial of a suppression motion is limited to determining whether the factual findings are supported by the record and whether the legal conclusions drawn from those facts are correct. *Commonwealth v. Bomar,* 573 Pa. 426, 826 A.2d 831, 842 (2003). Here, the trial court reviewed the photographs and determined that the photographic arrays

were not unduly suggestive and that the identifications were reliable and therefore admissible. Slip. op. at 4. Because the trial court's conclusion is supported by the record, we find no abuse of discretion.

Two photographic arrays are at issue. The first photo spread, which police detectives presented for Castillo's review on the night of the murder, consisted of black and white photographs of Hispanic males. Castillo did not identify appellant on the night of the murder. The second photo spread, which Castillo reviewed more than eight months later, consisted of eight color photographs of young Hispanic males with nose-rings. This latter photographic array was a random, computer-generated compilation based upon Zlatnik's crime-scene description of the shooter, *i.e.*, a young, light-complexioned, Hispanic male, with a nose-ring. Castillo selected appellant's photograph without hesitation and without prompting from the detectives. In doing so, he noted that appellant had shorter hair than he had had in the photograph shown to him on the night of the murder. After Castillo then proceeded to identify appellant's photograph in the first photo array as well, he explained that he had deliberately declined to do so on the night of the murder because he knew appellant from the neighborhood and was afraid of him. *Id.* at 10. Several weeks later, police showed Zlatnik the second photographic array. She selected appellant's photograph without hesitation and without prompting from the detectives.

Based upon this record, the trial court was correct in finding that appellant's supposed baldness in the second photo array did not create a substantial likelihood of misidentification. Indeed, Castillo actually knew appellant from the neighborhood and had identified his likeness in two separate photo arrays—one in which appellant apparently had more hair than in the other. Also, on the night of the murder, Zlatnik told police that she got a good look at the shooter and gave them a detailed description. At no time did she mention the shooter's hair, or lack of hair; in fact, she told police that he was wearing a baseball cap at the time of the shooting. Because the out-of-court identifications of appellant were not tainted,

we need not address appellant's derivative assertion that the in-court identifications of appellant should have been suppressed as well. *See Johnson, supra,* at 103 (having concluded that out-of-court photo-array identification was appropriate, Court need not address argument that witness lacked independent basis for in-court identification). Accordingly, this claim fails.

Appellant also raises several penalty-phase claims, including a claim that the prosecutor's summation at the penalty-phase was improper and prejudicial. Because we conclude that the prosecutorial misconduct claim warrants relief, we need not reach the other claims.

Appellant argues, *inter alia,* that the prosecutor ignored enumerated statutory mitigating/aggravating factors and undermined the jury's ability to render a fair verdict when he urged the jury to "send a message" by sentencing appellant to death:

> He has shown you again and again that he hurts people because he likes to and he want to, and he has earned the right to be on death row. **When you think of the death penalty, there are messages to be sent. There's a message on the street saying, look at that, he got death, you see that, honey, that's why you live by the rules, so you don't end up like that. Because they're in these bad neighborhoods.... You also send a message in prisons.** When you peep in that bus and talk and whisper, you can say, death penalty. Maybe you've got just one inmate sitting there going, well, he got death, this is serious, I don't want to end up like that. Maybe your penalty you'll save one guy, to scare him straight.

N.T. 9/17/99, at 24–25 (emphasis added). When the prosecutor completed his closing argument, appellant moved for a mistrial arguing, among other things, that the prosecutor's "send a message" statement was prejudicial. The trial court denied the motion. Counsel then asked the trial court to "tell the jury they should disregard everything [the prosecutor] said." *Id.* at 31. Appellant did not request a specific cautionary instruction regarding the prosecutor's "send a message"

argument, and the trial court issued no such instruction; however, in its charge concerning the jury's weighing of aggravating circumstances, the trial court adverted to the argument as follows:

It's terribly important that you also understand that in your evaluation of aggravators, that's those things that the Commonwealth says are aggravating circumstances, you should follow the law and you should not base your findings on the possibility of any future crimes that might be committed, and **you should not sentence him because one might feel that there is a need to send a message to the community, nor should you sentence him just because the other prisoners need some message.**

*Id.* at 64 (emphasis added).

The Commonwealth argues that the prosecutor was merely employing oratorical license and impassioned argument and notes that a prosecutor is afforded more latitude in doing so at the penalty phase. The Commonwealth also cites two cases in which this Court held that a prosecutor's "send a message" exhortation was within the bounds of permissible oratorical flair. *See Commonwealth v. Peterkin*, 538 Pa. 455, 649 A.2d 121, 129 (1994); *Commonwealth v. DeHart*, 512 Pa. 235, 516 A.2d 656, 667 (1986). Finally, the Commonwealth argues that any prejudice to appellant was cured by the trial court's instructions warning the jury that they should not sentence appellant in order to send a message.

Our adversary system permits the prosecutor to "prosecute with earnestness and vigor." *Berger v. United States*, 295 U.S. 78, 88, 55 S.Ct. 629, 79 L.Ed. 1314 (1935). Nevertheless, the arguments advanced must be confined to the evidence and the legitimate inferences to be drawn therefrom. *See Zettlemoyer*, 454 A.2d at 957; *Commonwealth v. Revty*, 448 Pa. 512, 295 A.2d 300 (1972). "Deliberate attempts to destroy the objectivity and impartiality of the finder of fact so as to cause the verdict to be a product of the emotion rather than reflective judgment will not be tolerated." *Zettlemoyer*, 454 A.2d at 957 (quoting *Commonwealth v. Brown*, 489 Pa. 285, 414 A.2d 70, 73 (1980)); *see also* ABA Standards for Criminal Justice 3–

5.8(d) ("The prosecutor should refrain from argument which would divert the jury from its duty to decide the case on the evidence.").

Although there is sometimes a "gray zone" separating acceptable from improper advocacy, this Court has categorically prohibited certain prosecutorial arguments that we have deemed extremely and inherently prejudicial. *See, e.g., Commonwealth v. Chambers,* 528 Pa. 558, 599 A.2d 630, 643 (1991). Thus, in *Chambers,* this Court held that a prosecutor's reliance upon the Bible or other religious writings as an independent source of law supporting the imposition of a death penalty is reversible error *per se. Id.* at 644; *see also Spotz,* 756 A.2d at 1165 n. 24 (noting that the proscription in *Chambers* is against "reliance upon the Bible as a source, independent of Pennsylvania law, for returning a verdict of death"). In so holding, the *Chambers* Court noted that such an appeal to Biblical bases for returning a death verdict constituted a deliberate attempt to destroy the objectivity and impartiality of the jury which could not be cured. Moreover, we noted that in invoking a religious reference in support of the death penalty, the prosecutor reached outside the law of the Commonwealth:

Our courts are not ecclesiastical courts and, therefore, there is no reason to refer to religious rules or commandments to support the imposition of a death penalty. Our Legislature has enacted a Death Penalty Statute which carefully categorizes all the factors that a jury should consider in determining whether the death penalty is an appropriate punishment and, if a penalty of death is meted out by a jury, it must be because the jury was satisfied that the substantive law of the Commonwealth requires its imposition, not because of some other source of law.

*Id.* at 644.

It is notable that the *Chambers per se* holding followed upon a series of cases in which this Court "narrowly tolerated" Biblical references, deeming them to be on the limits of oratorical flair but cautioning that such references were "a dangerous practice which we strongly discourage." *Id.* In

*Chambers*, we noted that, our cautionary teaching having been ignored, we would no longer tolerate such references, and indeed, would deem such references "reversible error *per se*" and might also "subject violators to disciplinary action." *Id.*

This Court has expressed similar concerns regarding prosecutorial arguments that exhort the jury to return a sentence of death in order to "send a message." Although until now we have not explicitly adopted a *per se* prescription similar to that set forth in *Chambers*, it is fair to say that we have been in the "narrow toleration" and close scrutiny stage for some time. This Court has repeatedly reminded the bench and bar that "send a message" exhortations in criminal trials are particularly prejudicial and should be avoided. *See, e.g., Commonwealth v. Crawley*, 514 Pa. 539, 526 A.2d 334, 344 (1987) ("[i]t is extremely prejudicial for a prosecutor to exhort a jury to return a death sentence as a message to the judicial system or its officers."); *see also Commonwealth v. Hall*, 549 Pa. 269, 701 A.2d 190, 202 (1997); *Commonwealth v. LaCava*, 542 Pa. 160, 666 A.2d 221, 237 (1995).[12]

As the Commonwealth correctly notes, in some of our older cases, this Court determined that, in some contexts, "send a message" arguments may be tolerable. *See Peterkin*, 649 A.2d at 129; *DeHart*, 516 A.2d at 667. In *DeHart*, we denied relief where the prosecutor stressed the general "deterrent effect" of the death penalty. *DeHart* relied upon this Court's decision in *Zettlemoyer*, which reasoned that a prosecutor's reference to the deterrent effect of the death penalty was not prejudicial because it was a matter of public knowledge based on ordinary human experience:

We do not believe that the impact of this statement, which is a "matter of common public knowledge based on ordinary human experience," would have biased or prejudiced the jury or hindered an objective weighing of the evidence, especially considering the district attorney's explicit di-

12. *Cf. Campbell v. State*, 679 So.2d 720, 724 (Fla.1996) ("Message to the community" arguments are "an obvious appeal to the emotions and fears of the jurors") (quoting *Bertolotti v. State*, 476 So.2d 130, 133 (Fla.1985)).

rections to the jury to return a verdict of death "solely and exclusively as the law indicates it may be [imposed], based on the circumstances of this case, that it involved a premeditated, intentional killing of a witness to a serious crime, a felony."

*Zettlemoyer*, 454 A.2d at 958 (footnotes and citations omitted).

Similarly, in *Peterkin* this Court concluded that, while a prosecutor may not exhort a jury to send a message to the judicial system, he may urge them to send a direct message to the defendant. 649 A.2d at 129. There, the prosecutor asked the jury to "[s]end out a message about the conduct engaged in by [the defendant] as he sits passively at that table, [that his conduct] cannot be condoned among civilized men." *Id.* In distinguishing this remark from similar "send a message" arguments that this Court had deemed improper, *see Crawley*, 526 A.2d at 344, we noted that the prosecutor's comments, viewed in context, had merely asked the jury to send a message to the defendant. Indeed, we noted that in his very next sentence the prosecutor said, "[t]ell [the defendant] what you did, when you did it, how you did and for the reason that you did it you must die." *Id.*

The *Peterkin* issue is not presented in the case *sub judice:* the prosecutor here did not exhort the jury to send a message to appellant. Arguably, the *Zettlemoyer/DeHart* situation also is not strictly at issue, as this was not an argument concerning the general "deterrent effect" of the death penalty. We would not overstate this distinction, however. We acknowledge that "send a message" and "deterrent effect" arguments are related in that they suggest that such an external factor may properly play a role in the jury's determination of life or death.

In any event, in the many years since *Zettlemoyer* and *DeHart* were decided, this Court has strongly admonished prosecutors to refrain from exhorting jurors to use their verdict to "send a message" to the community or the judicial system. *E.g., Crawley*, 526 A.2d at 344. This admonishment has particular significance when the sentence of death is at

stake. In contrast to the determination of guilt, which usually depends on relatively objective findings, the decision as to whether to impose a sentence of death depends upon the weighing of specific aggravating and mitigating circumstances that may involve subjective considerations. *See generally* Welsh White, *Curbing Prosecutorial Misconduct in Capital Cases: Imposing Prohibitions on Improper Penalty Trial Arguments,* 39 AM. CRIM. L. REV. 1147, 1149 (2002). Indeed, in *Crawley,* this Court noted that a prosecutor's argument asking the jury to send a message to the judicial system by returning a sentence of death is "extremely prejudicial" because a jury's determination must be based solely upon the evidence of aggravating and mitigating circumstances, and not upon an external emotional appeal. 526 A.2d at 344.[13] Nevertheless, we declined to reverse the sentence of death in that case because the two aggravating circumstances found in that case were neutral in character—*i.e.,* the defendant committed a killing while in the perpetration of a felony and he had been convicted of an offense before or at the time of the offense at issue for which life imprisonment of death was imposable— and because there were no mitigating circumstances found. *Id.* at 345. Accordingly, we determined that there was no weighing process that could have been adversely affected by the prosecutor's improper comments.

In *LaCava,* however, this Court held that improper remarks injecting external considerations during the penalty phase did warrant a new penalty hearing, in part because the remarks could have impermissibly influenced the jury's balancing of mitigating and aggravating circumstances in favor of a death sentence. 666 A.2d at 237. In that case, the Commonwealth pursued the single aggravating circumstance that the defendant had killed a police officer in the line of duty. Notwithstanding that this was the single aggravator, the prosecutor

13. The prosecutor in *Crawley* had urged the jury to return a sentence of death in order to send a message to a judge who had supposedly imposed a lenient sentence on the defendant following a previous murder conviction: "And I hope you—I know I will—send this judge a message that had you done your job back in 1971 [the victims] would be here today." *Id.*

attempted to expand the jury's focus to include society's victimization at the hands of drug dealers generally. In disapproving the prosecutor's appeal to this external factor, we concluded that the sole purpose of the prosecutor's comments regarding society's ongoing battle with the scourge of drugs was "to turn the jury's sentencing of appellant into a plebiscite on drugs and drug dealers and their destructive effect on society." *Id.* In concluding that the prosecutor's comments went beyond the permissible limits of oratorical flair and zealous advocacy, and were so prejudicial as to deprive the appellant of a fair trial, we further noted that, since the jury found two mitigating circumstances and only one aggravating circumstance, the comments could have impermissibly affected the jury's weighing of those factors. *Id.* Thus, we granted the appellant's request for relief on the ground of ineffective assistance of counsel for failing to object to the prosecutor's argument.

In *Hall,* this Court reaffirmed its, by then, long-standing disapproval of such "send a message" arguments by announcing a broader prohibition, which applied to any party at any stage of a criminal proceeding. 701 A.2d at 203. In that case, the prosecutor urged the jury to send a message by finding the defendant guilty of first-degree murder:

> I would ask you to send a message, and that is, you come out here from Philadelphia, as we have proven, and shoot someone like the defendant did, once in the face and once in the back of the head, you are guilty of first degree murder.

*Id.* at 202 (quoting prosecutor's statement). Ultimately, this Court concluded that the prosecutor's comments did not warrant relief because they were based upon the evidence presented and did not ask the jury to send a message to the judicial system or to potential criminals. Nevertheless, we explicitly warned the bar of this Commonwealth to avoid such exhortations in the future:

> While this Court in the past has approved statements concerning the jury sending "messages" with their verdicts in criminal cases, such exhortations, **made by either the prosecutor or the defense,** in essence urge the jury to

ignore their sworn duty to decide a matter only on the proper facts presented in evidence and the applicable law. Accordingly, **we advise all parties in criminal matters before any court in the Commonwealth to refrain from such exhortation in the future.**

*Id.* at 203 (emphases added).

■ Perhaps, as in the line of decisions which culminated in *Chambers*, this Court's clear directive in *Hall* proved too subtle.[14] In this instance, the directive was observed only by an extended breach, as the prosecutor inexplicably and directly exhorted the jury to impose the death penalty in order to send a message to people on the street and to people in prisons. The plea to such an external irrelevancy was so direct that it culminated in the prosecutor inviting the jury to sentence this appellant to death so as to "scare straight" others who might be considering murder. There was no role for such an argument here. The prosecutor's improper comments effectively invited jurors to ignore their sworn duty to decide the matter exclusively upon the facts presented concerning the weighing of specific statutory aggravating and mitigating circumstances. *See LaCava*, 666 A.2d at 237; *see also Chambers*, 599 A.2d at 644 ("[I]f a penalty of death is meted out by a jury, it must be because the jury was satisfied that the substantive law of the Commonwealth requires its imposition....").

This Court well appreciates the pressures and challenges of trying criminal cases, and particularly cases where the ultimate penalty is involved. We also recognize that there are many things that occur in the course of a trial which are beyond the control or anticipation of counsel and the trial judge—such as witnesses, jurors or spectators acting inappropriately. But one aspect of a trial which is far more subject to rational control is the behavior of attorneys—officers of this

**14.** Indeed, the Superior Court recently addressed a similar instance in which the prosecutor ignored this Court's disapproval of arguments exhorting jurors to "send a message." *Commonwealth v. Poplawski*, 852 A.2d 323, 328–29 (Pa.Super.2004) (prosecutor's arguments that turned case into referendum on bringing guns into community were improper under *Hall* and *LaCava*).

Court whose professionalism is absolutely indispensable to the fair administration of justice in this Commonwealth. Lawyers have an obligation to be aware of, and to abide by, the law governing the conduct of the matters in which they are involved. This Court's unambiguous directive in *Hall* was not aimed at the conduct of witnesses, or police officers, or jurors, or court staff, or judges: it was aimed directly at counsel. Moreover, it concerned a matter and stage of trial over which counsel have unique, indeed premeditated control: *i.e.,* what it is they intend to say to the jury. When this Court issues a directive concerning what is permissible at that stage, we expect officers of the Court to abide by that directive. In light of our explicit directive in *Hall,* which was but the last in a series of decisions expressing grave concern over this very type of argument, we are dismayed, to say the least, by the government lawyer's use of such prohibited rhetoric in this case.

We are aware that the trial judge in this case ultimately informed the jury that it "should not" sentence appellant in order to send a message. But we have little confidence that such a charge was adequate to remove the prejudice resulting from the prosecutor's decision to employ an inherently preju-dicial argument that had specifically been deemed off-limits. The jury in this case ultimately found two aggravating circum-stances and two mitigating circumstances, and thus was re-quired to weigh the competing factors to determine which ones predominated. In such an instance, the fact that the prosecutor had argued that a collateral external effect of a death verdict would be to send a message to others which might prevent future crimes—a factor which does not exist as a proper statutory aggravating circumstance—may well have played a role, direct or indirect, in at least one juror's balanc-ing process. *See LaCava,* 666 A.2d at 237 (relief warranted in context of ineffective assistance of counsel for failing to object where prosecutor's argument went beyond single aggravating circumstance at issue to inject improper additional basis for returning verdict of death; since both aggravating and miti-gating circumstances were found by jury, improper argument

"could have impermissibly shifted the balance in favor of a death sentence."). In this regard, it is also significant that the trial court's cautionary charge could be read as having inadvertently validated the prosecutor's non-record-based assumptions that a verdict of death indeed would send a message both to the community at large or other prisoners. In instructing the jury, the court did not question the accuracy or legitimacy of those assumptions, but instead directed that the jury should not base its verdict upon them. On such a record, we conclude that the ability of the sentencing jury to weigh the evidence objectively was fatally compromised and, accordingly, appellant is entitled to a new sentencing proceeding.

More importantly, we conclude here, as we did in *Chambers* when confronted with a similar challenge to this Court's directives concerning what comprises appropriate argument in the penalty phase of a capital trial, that penalty phase arguments requesting that the jury send a message with its verdict are prejudicial *per se*. We reach this conclusion in part because of the inherently prejudicial nature of the remarks, and in part as a matter of our supervisory authority over Pennsylvania attorneys. We do not reach the conclusion lightly. The inappropriate argument at issue here is similar to that at issue in *Chambers*. The argument goes to the very core of the penalty phase jury's task, injecting an improper external element in favor of death. As this Court has made clear in the decisions culminating in *Chambers* and *LaCava*, it is essential that arguments made in favor of the ultimate penalty be confined to those statutory aggravating circumstances which are specifically charged and which thereby serve as the only appropriate basis for a verdict of death. Given the critical balancing process required of the penalty phase jury, the important individual role of jurors in this assessment, the inherently prejudicial nature of the argument, and the fact that the content of a lawyer's argument is easily within his control, we will no longer proceed with case-by-case assessments in this area. Such arguments are to be avoided and the peril of defiance is to fall upon the party who would flout the rule.

Accordingly, for the foregoing reasons, this Court affirms appellant's convictions, but vacates the sentence of death and remands this matter for a new sentencing hearing. Jurisdiction is relinquished.

Former Chief Justice ZAPPALA did not participate in the decision of this case.

Justice EAKIN files a concurring opinion in which Justice NEWMAN joins.

Justice EAKIN, concurring.

I agree the prosecutor here crossed the line. Most "message sending" statements indicate the advocate lacks a better reason for the verdict sought; a solid case does not require a resort to such vagaries and extra-judicial social commentary. All verdicts send peripheral messages of one kind or another, but such collateral consequences are not a proper basis for a jury's decision and hence are not for counsel to argue.

However, I believe a *per se* rule is unwise and unnecessary. This may be similar in concept to invoking the deity, but it is not on a par with religious hyperbole, nor is the problem so pervasive as to be beyond the leash of existing jurisprudence. A *per se* rule will, of necessity, lead to more litigation, not less, for now any words by the prosecutor that may somehow be interpreted as implying a request for a message will be challenged; indeed, *must* now be challenged on pain of ineffectiveness.

It is likewise improper for defense counsel to ask for a message to be sent, but there is no meaningful curative sanction in the immediate trial. The prosecution has the right of fair response—may that response include a request for a contrary message? Can a curative instruction be asked for by defense counsel who thinks the penalty phase has gone well; is a new penalty phase the only cure, or may the objection to a *per se* rule of this Court be waived? We will undoubtedly have to face these questions and a host of variations in the not too distant future.

*Per se* rules addressing the fluid and extemporaneous flow of trial advocacy are not the cure-all they may appear. Hence, the trend of the criminal law is away from fixed recipes for evaluating error and toward a totality of the circumstances perspective for review. *See, e.g., Florida v. Bostick,* 501 U.S. 429, 111 S.Ct. 2382, 115 L.Ed.2d 389 (1991) (rejecting *per se* rule prohibiting police from randomly boarding buses as means of drug interdiction); *Commonwealth v. Smith,* 575 Pa. 203, 836 A.2d 5 (2003) (applying *Bostick's* totality of circumstances test); *Illinois v. Gates,* 462 U.S. 213, 103 S.Ct. 2317, 76 L.Ed.2d 527 (1983) (standard for evaluating whether probable cause exists is totality of circumstances); *Commonwealth v. Gray,* 509 Pa. 476, 503 A.2d 921 (1985) (totality of *Gates'* circumstances test for determining existence of probable cause meets requirements of Article I, § 8); *Commonwealth v. Druce,* 577 Pa. 581, 848 A.2d 104 (2004) (declining to adopt *per se* rule requiring recusal of judge for violation of Judicial Code of Conduct); *Commonwealth v. Perez,* 577 Pa. 360, 845 A.2d 779 (2004) (holding voluntary statements by accused, given more than six hours after arrest when accused has not been arraigned, no longer inadmissible *per se;* courts must examine totality of circumstances surrounding confession); *Commonwealth v. Mack,* 568 Pa. 329, 796 A.2d 967 (2002) (declining to adopt bright-line rule that consent to search is *per se* involuntary when police advise suspect they "would have to get a search warrant" if suspect refuses search); *Commonwealth v. DeJesus,* 567 Pa. 415, 787 A.2d 394 (2001) (rejecting *per se* rule that declaratory statements by police concerning charges against suspect are functional equivalent of interrogation; rather, totality of circumstances test applies).

I believe this evolution is wise and appropriate; creating a new *per se* rule is neither. Our present tests allow courts to address each situation individually. Allowing flexibility is preferable to creating bright-line rules then creating exceptions when the inevitable variation on the facts arises; I suspect that in a very few years, we will have our share of exceptions to this *per se* rule as well.

Accordingly, I join in reversing the penalty imposed, but cannot agree with the creation of a *per se* rule as pronounced by my colleagues.

Justice NEWMAN joins.