**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| RAYMOND JONES | : | |
| | : | |
| Appellant | : | No. 1517 EDA 2021 |

Appeal from the Judgment of Sentence Entered March 25, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0002568-2018

BEFORE: McLAUGHLIN, J., McCAFFERY, J., and PELLEGRINI, J.[*]

MEMORANDUM BY PELLEGRINI, J.:         **FILED AUGUST 04, 2022**

Raymond Jones (Jones) appeals from the March 25, 2019 judgment of sentence imposed by the Court of Common Pleas of Philadelphia County (trial court) following his convictions for rape, rape of a child, unlawful contact with a minor, corruption of minors and endangering the welfare of a child.[1]  We affirm.

**I.**

We glean the following facts from the certified record.  In January 2017, Jones drove the victim, her mother, Sarah Moore (Moore), and her cousin to

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S. §§ 3121(a)(1), 3121(c), 6318(a)(1), 6301(a)(1)(ii) & 4304(a)(1).

the Sugar House Casino in Philadelphia. The victim knew Jones as a friend of her uncle. The victim was 12 years old at the time and was not permitted in the casino, so she stayed in the car with Jones while the other two went inside. At one point, she moved to the front seat of the vehicle to use Jones's cell phone and Jones rubbed her thigh. She became uncomfortable and moved to the back seat. Jones followed her into the back seat, pulled her pants and underwear down and raped her. After several minutes, he ejaculated on the back seat. He then returned to the front seat of the vehicle and drove to a nearby WaWa.

Shortly thereafter, a security guard approached the vehicle and asked Jones to retrieve Moore, who was removed from the casino for being intoxicated. Jones and the victim picked up Moore and returned home. In the days after the incident, Moore asked the victim if anything had happened with Jones while they were in the car, and she responded, "yes." N.T., 1/9/19, at 47. Moore said they could talk about it later but they never spoke about the incident again. The victim said that she was afraid to tell her mother about the assault and that she did not know whether Moore would believe her.

In September of that year, Jones began dating Moore and would occasionally sleep at their apartment. On Thanksgiving of 2017, the victim woke up after sleeping in her mother's bedroom and took a shower. Thinking she was alone in the apartment, she went into her own bedroom afterwards wearing only a towel. When she entered the room, she found Jones asleep

on her bed. She attempted to pick up her clothes and shoes and leave the room to get dressed, but Jones grabbed her by the wrist and pulled her back into the room. He pushed her face down on the bed and raped her before ejaculating on the bed. After the rape, the victim took another shower. She again did not tell her mother what happened.

In early December 2017, the victim told her school counselor, Ashley Diggs (Diggs), about the assaults. The victim said that after speaking with a friend at school, she thought about the assaults again, and she began to cry and was taken to the counselor's office. During that conversation, the victim said that she only told Diggs that she had been touched. Diggs reported the disclosure to the Department of Human Services (DHS) and an investigation was opened.

At trial, Jones cross-examined the victim regarding a story she had written in school when she was 11 years old. She had been given an assignment to write about a difficult event in her life, and when she could not think of anything to write about, she fabricated a story about having a twin sister who had been raped, contracted AIDS and died as a result. Her teacher found the essay alarming and referred the matter to the school counselor. Moore confirmed at trial that she recalled this story and attended a meeting with the victim and the school counselor as a result. When asked about the story at trial, the victim initially admitted to lying about having a twin sister but denied writing a story about her dying after a rape. On redirect, she

testified that she had written a story about a fictitious twin but clarified that the twin died after being shot. She also testified that she was not sure that her mother would believe her allegations because she had lied to her in the past to get out of trouble.

At trial, Moore testified that she recalled being driven to the casino with the victim by Jones on an evening in January 2017. She did not remember many details of the night because she was intoxicated. The next morning, the victim told her that Jones had touched her on the leg and she told the victim that she would not have to be alone with him anymore. She said that she did not ask further questions because she was embarrassed about her behavior that night and wanted to forget about it.

In October or November 2017, Moore began dating Jones. On Thanksgiving, she went to work in the morning and left Jones asleep in the victim's bedroom, where they had spent the night due to a pest problem in her own room. She learned about the rape allegations after the victim disclosed the assaults to her school counselor.

Moore said that the victim had been in trouble for lying in the past and she punished her by taking away her cell phone or prohibiting her from seeing her friends on the weekends. She testified that she did not want to believe the accusations at first because she felt that she had failed her daughter. She believed the victim at the time of trial because she had attempted suicide

three times since the assaults occurred. Moore also said that the victim had disliked two of her previous boyfriends but had never accused them of assault.

Diggs testified at trial regarding the victim's initial disclosure of the assaults. Diggs had been familiar with the victim for a few months and knew her to be upbeat, happy and talkative, but on the day of the disclosure, she was down, not making eye contact and speaking in a flat tone. The victim said "it" was done on two occasions, once at the casino and once in her home, but did not clarify what she meant. *Id.* at 107. She also told Diggs that Jones put his hand on her leg in the car before "it" happened, and when asked if this had happened before, she said it happened in her bedroom as well.

Detective Kimberly Boston (Detective Boston) of the Philadelphia Police Department's Special Victims Unit investigated the allegations after receiving the referral from DHS. She testified that delayed disclosures of abuse are very common in cases involving child victims and, as a result, physical evidence such as DNA is difficult to recover. By the time of the report, the casino's surveillance cameras had been taped over and she could not recover footage of the parking lot during the assault. She testified that interviews of the victim are often the most important part of her investigations.

When asked whether she would have been able to recover DNA from the car or apartment, Detective Boston testified that she would not be able to unless she learned about that evidence with 24 to 48 hours of the assault. She did not recall being told that there may be physical evidence in the car or

the victim's bedsheets in this case. She said that she had investigated 250 cases that year and had two in which she recovered DNA evidence, and only two or three cases involving a prompt disclosure of the abuse by the child.

Detective Boston reviewed the summary of the victim's forensic interview generated by the Philadelphia Children's Alliance (PCA), which said that the first person the victim told about the assaults was Diggs. The summary did not mention the victim's conversation with her mother in January or with her friend at school shortly before the disclosure to Diggs. Detective Boston testified that disclosure of abuse is a process and she considered the forensic interview to be the victim's first full disclosure, as she had not previously disclosed all the details of either assault.

Sharina Johnson (Johnson) from DHS also testified as to her investigation into the victim's allegations. She interviewed the victim twice prior to the forensic interview and said that she had seemed nervous, withdrawn and irritated. The victim disclosed two separate occasions of abuse and said that Jones had told her not to say anything about what happened. In her report of the first interview, Johnson had written that the first incident occurred when Jones touched the victim's leg in her bedroom and that she denied any penetration occurred. The victim reported that the second incident occurred at the casino but, again, denied that sexual intercourse occurred. During the second interview, which occurred the following day, the victim again reported that the bedroom incident occurred first but said that she was

raped on both occasions. Johnson wrote that Moore "struggled to understand why [the victim] won't talk to her and also made a comment [the victim] could be doing this for attention." N.T., 1/10/19, at 23.

Finally, Takesha Allen (Allen), a forensic interviewer from PCA, testified that the victim disclosed in her interview that Jones had raped her on two occasions, first in January or February at the casino and then on Thanksgiving in her bedroom. The victim told Allen that Diggs was the first person she told about the assaults.

A jury convicted Jones of the above-mentioned offenses and the trial court sentenced him to an aggregate of 17 to 34 years' imprisonment. Following the reinstatement of his appellate rights, Jones timely appealed and he and the trial court have complied with Pa. R.A.P. 1925.

## II.

Jones raises two issues on appeal: whether the evidence was sufficient to sustain his convictions and whether the trial court abused its discretion by granting the Commonwealth's pretrial motion *in limine* to exclude evidence that the victim had been released from a psychiatric hospital the day before the Thanksgiving assault.

**A.**

In his first argument, Jones does not argue that the Commonwealth failed to present evidence of any specific element of the crimes charged.[2] Rather, relying on **Commonwealth v. Sullivan**, 371 A.2d 468, 479 (Pa. 1977), he argues that the evidence, particularly, the victim's testimony, was so weak and inconsistent that it could not as a matter of law support his convictions beyond a reasonable doubt. He highlights several inconsistencies in the victim's testimony and her prior disclosures of the assaults, her history

_____

[2] Our standard of review for a sufficiency claim is well-settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [this] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition, we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

**Commonwealth v. Lopez**, 57 A.3d 74, 79 (Pa. Super. 2012) (citation omitted).

of lying and psychological instability, her hostility toward her mother and the "implausibility" of her account of the rape in the casino parking lot. Jones's Brief at 5-6.

In **Sullivan**, our Supreme Court reiterated that the Commonwealth's burden of proof in a criminal case is no lower when its case rests primarily on circumstantial rather than direct evidence: in all cases, it must prove each element of the crime charged beyond a reasonable doubt. **Sullivan**, **supra**. "Restated, the facts and circumstances need not be absolutely incompatible with defendant's innocence, but the question of any doubt is for the jury unless the evidence 'be so weak and inconclusive that as a matter of law no probability of fact can be drawn from the combined circumstances.'" **Id.** (quoting **Commonwealth v. Libonati**, 31 A.2d 95, 97 (Pa. 1943)). While issues of credibility are typically addressed to fact-finder and concern the weight of the evidence presented at trial, our Supreme Court has also explained that evidence may be so weak or inconsistent as to be insufficient as a matter of law:

> Traditionally under our system of jurisprudence, issues of credibility are left to the trier of fact for resolution. . . . This concept, however, must be distinguished from an equally fundamental principle that a verdict of guilt may not be based upon surmise or conjecture. Following this principle, courts of this jurisdiction have recognized that where evidence offered to support a verdict of guilt is so unreliable and/or contradictory as to make any verdict based thereon pure conjecture, a jury may not be permitted to return such a finding.

*Commonwealth v. Karkaria*, 625 A.2d 1167, 1170 (Pa. 1993) (citation omitted); *but see Commonwealth v. DeJesus*, 860 A.2d 102, 107 (Pa. 2004) (evidence not so unreliable and contradictory as to be insufficient when witnesses' testimony differed only on minor details from each other, their stories were consistent as to the crucial facts and elements were corroborated by a third witness).

Here, the evidence presented at trial, when properly viewed in the light most favorable to the Commonwealth, was amply sufficient to support Jones's convictions. While Jones assails the "implausibility" of the assault in the casino parking lot, the testimony at trial established that the assault occurred on an evening in January when it would have already been dark. *See* Jones's Brief at 9. Even though the vehicle's windows were not tinted, visibility would have been poor, and Detective Boston testified that in her experience, it would be possible for an assault to occur in those circumstances without any witnesses. Additionally, Moore testified that she left the victim and Jones alone in the vehicle when she went into the casino, and the victim told her the next day that something had happened with Jones. Finally, the victim's recounting of the events to the forensic interviewer and at trial remained consistent, as she repeatedly stated that she moved into the back seat of the car after Jones put his hand on her leg, and he then followed her into the back seat and raped her. This testimony was not so weak and inconclusive as to render the verdict as based purely on speculation and conjecture.

Jones also argues that the victim had a history of lying based on a school assignment she wrote when she was 11 years old and because she admitted to lying to her mother in the past. He contends that her suicide attempts following the rapes evidenced mental instability and speculates that she harbored resentment toward her mother after being exposed to Moore's abusive relationship with another man. However, the jury was presented with this evidence and nevertheless concluded that the victim's accounting of the rapes was truthful, as it was free to do. While the victim admitted to fabricating a story about the death of a twin sister for a school assignment, the jury was entitled to conclude that an incident of lying for a school assignment, which occurred years prior to trial, did not render the entirety of her testimony unreliable.

Moreover, the testimony at trial established that the victim did not report the rapes when she was in trouble at home or school so that she could garner sympathy, and Moore reported that the victim had previously disliked men she dated but had not accused them of rape. Finally, the jury could conclude that the victim's suicide attempts, which occurred after she was first assaulted by Jones, stemmed from the stress and trauma of the rapes rather than from a mental instability that rendered her incredible as a witness. Taken together, these incidents do not undercut the victim's reliability to the extent that the verdict is based purely on speculation and conjecture. *Sullivan*, *supra*.

Finally, Jones identifies inconsistencies in the victim's recounting of events at trial compared to the summary of her description of the events at her forensic interview. Our review of the record reveals that any inconsistencies are minor and the salient points of her accounting of the assaults remained unchanged. **See DeJesus**, **supra**. Accordingly, the jury's verdict was supported by sufficient evidence and no relief is due.

## B.

Next, Jones argues that the trial court abused its discretion by granting the Commonwealth's motion *in limine* to exclude from trial any evidence that the victim had been released from a psychiatric hospital the day before the Thanksgiving rape.[3] He argues that he should have been permitted to impeach the victim with this evidence as it was relevant to her credibility and her ability to recall the incidents.[4]

_____

[3] The Commonwealth's written motion does not appear in the certified record, though oral argument was held on the motion prior to jury selection. It is well-established that an appellant bears the burden of ensuring that the certified record on appeal contains all documents necessary to our review and we could deem this issue waived on this basis. **See** Pa. R.A.P. 1921; **Commonwealth v. Edwards**, 594 A.2d 720, 721 n.4 (Pa. Super. 1991). However, because the transcript of the oral argument on the motion includes the relevant details for our analysis and the trial court addressed this issue in its opinion pursuant to Pa. R.A.P. 1925(a), we decline to find waiver.

[4] "The admission of evidence is solely within the discretion of the trial court, and a trial court's evidentiary rulings will be reversed on appeal only upon an abuse of that discretion. An abuse of discretion will not be found based on a mere error of judgment, but rather occurs where the court has reached a conclusion that overrides or misapplies the law, or where the judgment
*(Footnote Continued Next Page)*

"[O]nly mental health disabilities that impair a witness's ability to observe, recall, or report events, are relevant and admissible to impeach a witness's credibility." **Commonwealth v. Miller**, 212 A.3d 1114, 1125 (Pa. Super. 2019) (quoting **Commonwealth v. Davido**, 106 A.3d 611, 637 (Pa. 2014)). "The evidence can be said to affect credibility when it shows that the witness's mental disorganization impaired his or her capacity to observe an event at the time of its occurrence, to maintain a clear recollection of it, or to communicate the observation accurately and truthfully at trial." **Davido**, **supra**, at 637. Mental illnesses or disabilities that do not affect the witness in these areas are not relevant to assessing the credibility of the witness's testimony. **Id.** at 636-37 (evidence of witnesses' depression, post-traumatic stress disorder, intermittent explosive disorder, substance abuse, attention deficit disorder and suicide attempts not relevant to determine weight and credibility of their testimony).

Prior to trial, the Commonwealth filed a motion *in limine* asserting that the victim had been hospitalized for two weeks following a suicide attempt and was released the day before Thanksgiving in 2017. The following exchange during oral argument on the motion constituted the entirety of Jones's argument regarding the mental health commitment:

exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will." **Commonwealth v. Woodard**, 129 A.3d 480, 494 (Pa. 2015) (cleaned up).

[**Defense Counsel**]: If I had my dates correct, and I'm sure the Commonwealth will correct me if I don't, I believe, again, I could be wrong, I believe she was released from the mental hospital the night before the second allegation against Mr. Jones occurred. If I have my dates correct, I believe that is incredibly relevant. Someone, pretty much, just getting out of a mental hospital mere hours before making an allegation. It's certainly something that the jury should hear.

THE COURT: But how is that relevant in terms of—there has been no issue about her competency, no issue that—I know that there is a suicide attempt, but is there any issue that she hallucinates or has other mental disturbances that would bear on her credibility? . . . She may be troubled and issues regarding that, but I'm not sure how her hospitalization—unless it was because she was, for example, schizophrenic and couldn't differentiate reality from fantasy, that might be relevant.

[**Defense Counsel**]: I would argue that is a call for the jury to make in their role as determining the credibility of all witnesses. It's a major factor in determining the credibility of someone who is making a claim hours after leaving a mental institution from an involuntary stay.

THE COURT: She was committed because of the suicide attempt. Is there any other evidence regarding any issues of hallucinations or schizophrenia or anything like that?

[**The Commonwealth**]: Nothing like that.

THE COURT: I am going to grant that motion in terms of—based on what I heard. No discussion regarding that. You will be able to cross-examine her. You will be able to go into—let me put it this way. Stay away from Friend's Hospital and her state of mind and what was going on at the time of the incident. I don't think any mention of her trying to commit suicide or Friend's Hospital is appropriate.

N.T., 1/8/19, at 9-10. As Jones acknowledges, evidence of the victim's suicide attempts was nevertheless admitted at trial during Moore's testimony.

The trial court did not abuse its discretion in holding that the victim's discharge from the psychiatric hospital the day before the second rape was not relevant impeachment evidence. The record establishes only that the victim was hospitalized following a suicide attempt; as the trial court recognized at oral argument, there was no indication that the hospitalization was caused by a mental disability or impairment that impacted her "ability to observe, recall, or report events." **Miller**, **supra**. On appeal, Jones similarly does not make any argument that the victim suffered a mental condition that would impact her testimony in this way. He merely posits that the hospitalization was relevant in the context of the testimony about the victim's fabricated story about a twin sister, her history of suicide attempts and her exposure to Moore's abusive relationship. However, those circumstances are collateral to her mental health treatment and do not establish that she suffered from a mental disorder that impacted her credibility under **Miller** and **Davido**. No relief is due.

Judgment of sentence affirmed.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*


*Date: 8/4/2022*

- 15 -