J-S53038-16

NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37

| COMMONWEALTH OF PENNSYLVANIA | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| v. | |
| JACK EMERY GIRARDI | |
| Appellant | No. 364 MDA 2016 |

Appeal from the Judgment of Sentence January 13, 2016
in the Court of Common Pleas of Lycoming County Criminal Division
at No(s): CP-41-CR-0001977-2014

BEFORE: BOWES, SHOGAN, and FITZGERALD,[*] JJ.

MEMORANDUM BY FITZGERALD, J.:                    **FILED SEPTEMBER 15, 2016**

Appellant, Jack Emery Girardi, appeals from the judgment of sentence entered in the Lycoming County Court of Common Pleas following a jury trial and his convictions for rape of a child,[1] statutory sexual assault,[2] aggravated indecent assault of child,[3] unlawful restraint of minor by parent— risk of serious bodily injury,[4] incest of minor—complainant under 13 years,[5]

_____

[*] Former Justice specially assigned to the Superior Court.

[1] 18 Pa.C.S. § 3121(c).

[2] 18 Pa.C.S. § 3122.1(b).

[3] 18 Pa.C.S. § 3125(b).

[4] 18 Pa.C.S. § 2902(c)(1).

[5] 18 Pa.C.S. § 4302(b)(1).

endangering welfare of children,[6] corruption of minors,[7] and indecent assault—complainant under 13 years.[8] Appellant challenges the sufficiency of the evidence, the denial of his motion for a mistrial, and the admission of a prior recorded interview of Child, his minor daughter, as substantive evidence. We affirm.

On August 21, 2014, Child was interviewed at the Child's Advocacy Center ("CAC").[9] R.R. at 85a.[10] The police and Children & Youth Services request that CAC conduct interviews. *Id.* at 249a. Sherry Moroz was "a forensic interviewer at the [CAC] of the Central Susquehanna Valley." *Id.* at 244a. Her job was "to conduct an interview of any child who [was] an alleged victim of or a witness to sexual abuse, physical abuse or violent crime." *Id.* She interviewed Child on August 21, 2014. *Id.*

---

[6] 18 Pa.C.S. § 4304(a)(1).

[7] 18 Pa.C.S. § 6301(a)(1)(ii).

[8] 18 Pa.C.S. § 3126(a)(7).

[9] The interview was recorded and transcribed. *See* R.R. at 85a-137a. We note that the transcript of the interview was not included in the certified record on appeal. Where the accuracy of a transcript is undisputed, this Court can consider it even though it was not in the record transmitted to this Court. *Commonwealth v. Barnett*, 121 A.3d 534, 545 n.3 (Pa. Super. 2015), *appeal denied*, 128 A.3d 1204 (Pa. 2015). In the case *sub judice*, the Commonwealth chose not to file a brief. Thus, the accuracy of the transcript of the interview is undisputed. Therefore, we can consider it. *See id.*

[10] For the parties' convenience, we refer to the reproduced record where applicable.

She explained that:

> the CAC is a facility-based program that offers a multi-disciplinary-team approach to the investigation of child abuse. So in order to have a child come to the CAC there needs to be some sort of an allegation.

> \* \* \*

> And at the CAC we provide several services. We provide an interview. We provide counseling. We provide medical exams. And we provide a place for—a child-friendly place, not the most formal place, but a child-friendly-place, for a team together to determine what the allegations truly are and what services or actions need to be taken to assure and maintain the safety and health and well being of the child.

*Id.* at 248a.

One copy of the recording of the interview "is retained as part of the child's medical record at the CAC, and the other one is released to law enforcement." *Id.* at 250a. The DVD was played for the court. *Id.* at 252a.

At the time of the interview, Child stated she was seven years old and starting second grade the following day.[11] *Id.* at 87a. She lives with her mother and her five-year old brother. *Id.* at 92a.

> [Sherry Moroz]: . . . Is someone worried that something happened to you?

> A: Some things did.

> \* \* \*

> Q: Okay. So what kinds of things happened?

---

[11] Mother stated that Child was a year ahead in school. R.R. at 32a.

- 3 -

A: He was touching me.

Q: Okay.  Who was touching you?

A: My dad was touching me—

            *    *    *

Q: Yeah, did you tell your mom?

A: I told my mom . . . .

            *    *    *

Q: Okay.  Tell me—like start at the beginning and tell me everything you can think of.

            *    *    *

Q: I remember that he was trying to make me sit on his thing.

Q: Okay.

A: But he was trying to force me to do it.

Q: Uh—huh.

A: And he was touching my butt with the lotion and in between it.

Q: Uh—huh.

A: And my thing in the front.

*Id.* at 96a, 98a.  She testified that "[e]very single time [it happened] her mommy was at work and [her brother] was sleeping." *Id.* at 100a.

A: And daddy kept taking me every time in the middle of the night—

Q: Uh-huh.

- 4 -

A: —after he gives me a bath—

Q: Uh-huh.

A: He takes me right in the back bedroom.

*    *    *

Q: Okay, so what would he do when it was bath time?

A: That's when he would always make me try to sit on his thing.

Q: Okay.

A: And he was forcing me to.

Q: Okay.

A: And I was saying no, but he wouldn't stop.

Q: Okay.  All right.  So when—when he was wanting you to sit on his thing, like, where was he?

A: He was in the bathtub with me.

*    *    *

Q: Okay.  Where did his thing go?

A: In my butt.

*    *    *

Q: Okay.  All right.  Okay, so you said that sometimes things would happen in the bathroom in the tub.

A: Or in the back bedroom.

Q: Or the back bedroom, okay.  The stuff that happened in the tub, okay, did it happen in the tub one time or more than one time?

A: More than one time.

- 5 -

*   *   *

Q: . . . Tell me about what would happen in the bedroom.

A: He would do that stuff, like, either rub my ladybug or belly with that lotion—

*   *   *

A: He puts his thing in my front thing.

Q: Uh-huh.

A: I tell him no but he won't stop.

Q: Okay.  What does that feel like?

A: I don't like it when he does it.

Q: Un-huh.

A: Because he hurts me.

Q: Un-huh.

*   *   *

Q: Okay.  And you said that this was happening in 1st grade?

A: Yeah, when I first started 1st grade.

Q: Okay.  All right.  Now, what happened that you decided to tell mommy.

A: I told her what he was doing to me.

*   *   *

Q: . . . Does anything come out of his thing?

A: No.

\*     \*     \*

Q: So I have these picture [sic] so what I'm going to do is I'm going to put this here. I'm going to circle body parts and if you could tell me what you call me [sic] those parts, okay, so I know what you're talking about for sure. What do you call right there?

A: Neck

Q: Neck. What do you call that part?

A: Chest.

\*     \*     \*

A: Ladybug.

\*     \*     \*

A: Manbug.

\*     \*     \*

Q: . . . What made you decide to tell?

A: Because it was really bothering me.

\*     \*     \*

Q: . . . [I]t was just kind of bothering you when you needed to tell your mom?

A: Uh-huh.

Q: So tell me what you told your mom.

A: I told her the same things that I just told you.

\*     \*     \*

A: I told her what I told you because I didn't remember anything else.

Q: Okay.  Do you think more stuff happened that you don't remember?

A: More stuff did happen and I just don't remember it.

*    *    *

Q: Uh-huh. Did you ever tell your mom before that?

A: (Shakes head back and forth).

Q: No.

A: Because he wouldn't let me up and she was already at work.

Q: Uh-huh.  What do you mean he wouldn't let you up?

A: He was on me and he wouldn't let me up.

Q: What did that feel like with him on you?

A: He was hurting me and I couldn't breath[e].

Q: Where was—where were you hurting?

A: He was hurting me on the chest because I couldn't breath[e], and I couldn't breath[e] because he was hurting me.

Q: Okay.

A: I couldn't scream because I couldn't breath[e].

Q: Uh-huh.  And tell me, like, did he have any like—like names that he called you or anything that he would tell you when that was—when he was doing those things?

A: He was, um—calling me some names—

Q: Uh-huh.

A: —that he calls mommy when he gets angry.

Q: Like what?

A: Um, could I just write them down on the paper?

Q: If you want to. Can you write—okay.

A: I really don't know how to spell the words.

Q: Okay. I think your [sic] spelling bitch?

A: Uh-huh.

Q: Okay, when would he say that to you?

A: He was doing that because I wouldn't stay still because I was trying to get up and he kept calling me that word that I just spelled and some other names, like—he was saying—he was saying that word.

Q: Okay.

A: And saying to stay still and the end he said this.

Q: Okay. So he was saying—he was saying fuck?

A: He was saying that word—

\* \* \*

Q: [W]hat body parts were involved?

A: He was using.

Q: His manbug, you're point [sic] to?

A: On my—

Q: On your ladybug?

A: Uh—huh.

Q: So when he was doing that, like, where were you and—like, how was your body and how was his body?

A: He was on top of me. I was like this laying down on the mattress.

Q: Un-huh.

A: And he was like this.

Q: Like—okay.

A: Laying forward on me like this.

Q: Okay. All right, and where was his manbug going?

A: In my thing.

Q: In the front?

A: Uh-huh.

Q: Yeah? And what did that feel like?

A: It felt hard.

Q: Uh-huh.

A: Rusted wood or bark—

Q: Okay.

A: Bark on a tree.

Q: Okay.

A: And it was really hurting me and I told him to stop and he wouldn't stop.

Q: Okay. Did you ever see, like any—anything, like, left on your body when he was finished?

A: Nu-huh.

* * *

Q: . . . So when you were six you told mommy everything?

A: Yeah.

*   *   *

Q: And daddy left?

A: Uh-huh.

Q: Did daddy come back then?

A: Nope. . . .

*Id.* at 100a, 102a, 105a, 107a, 109a-10a, 113a-15a, 122a, 124a-27a, 130a.

On March 23, 2015, a hearing was held to address Child's competency to testify at trial. At the hearing, Child testified that she was turning eight years old. R.R. at 206a.

The Court: Okay. Now, in this case, okay, meaning why we're here, you said that your dad did something to you.

[Child]: (Nods head.)

The Court: Right?

[Child]: Yes.

*   *   *

The Court: . . . [H]ow long ago did this stuff happen?

[Child]: When I was in first grade.

The Court: . . . So how many years ago was that . . . ?

[Child]: . . . A year ago.

The Court: . . . How old were you when it happened? Do you remember?

[Child]: Six.

The Court: Six?

[Child]: Actually seven, because it was near the end of the year.

                     \*     \*     \*

The Court: . . . And how many times did it happen?

[Child]: Three times.

The Court: Three times?

[Child]: Or more, I don't remember.

                     \*     \*     \*

The Court: So tell me about the times. Tell me will [sic] happened.

[Child]: One time I was sleeping and I woke up because I had to go to the bathroom, and I woke up, and when I was done my dad told me to get undressed, and he told me to get in the bath, and while I was getting a bath he got undressed and got in with me.

The Court: Okay.

[Child]: And while we were waiting for the water I was being so loud because I was trying to get my mom up, but then at last I noticed that my mom wasn't there and my brother was the one that woke up.

The Court: Okay.

[Child]: And my dad got dressed really quick.

                     \*     \*     \*

The Court: And what happened to you when you were in the tub with your dad?

[Child]: He was trying to make me sit on his man bug.

- 12 -

The Court: Okay, what's that?

[Child]: His front private.

*    *    *

The Court: . . . He tried to make you sit on it?

[Child]: (Nods head).

The Court: What part of you?

Child: The—my butt.

*    *    *

The Court: . . . And how did he try to make you sit on it?

[Child]: He was forcing me, he was like pushing me down.

*    *    *

The Court:  [H]ow many times did it happen before you told your mom?

[Child]: Three times.

*    *    *

And I couldn't scream or anything like that when he was on top of me because he was so heavy, and he was going like this on my mouth.  And I could barely breath because he—

*    *    *

The Court: . . . Was this the second time or the third time?

[Child]: The second time it was the bathtub, the first time it was this, then the last time it was also this.

*    *    *

The Court: [S]o tell me about those.

\*　　\*　　\*

[Child]: He would always get undressed, and he would take my clothes off when I'm sleeping.  I know it because I always feel it, and then he would get on top of me and do this, like cover my nose so I can't scream or breathe or anything, then I pass out, and when he did this a little bit later I wake up from him doing this.

\*　　\*　　\*

The Court: What did he do with you before you passed out?

[Child]: He would like get on top of me, unzip his pants and take then off, take his underwear off, then put his front private in my front private.

\*　　\*　　\*

It would feel like hard, and it would go into my front private, and it would always be hard—harder, feel like a piece of metal.

*Id.* at 213a-16a.

On October 13, 2015, a hearing was held on the Commonwealth's motion to admit the recorded interview with Child at the CAC as substantive evidence pursuant to 42 Pa.C.S. § 5985.1.  R.R. at 233a-54a.  On October 14, 2015, the court granted the Commonwealth's motion.  Order, 10/14/15.

On October 19, 2015, Child testified at the jury trial.  She identified Appellant as her father.  R.R. at 8a.

[The Commonwealth]:  . . . Did something happen with your dad . . . that had to do with a bathroom?

\*　　\*　　\*

- 14 -

> [Child]: He would tell me to get undressed, get undressed
> while he was getting undressed.  Tell me—he would get in
> the tub, and he would tell me to get in the tub.  He would
> tell me to stand up and tell me to sit on his man-bug, but I
> wouldn't.  And he was—he had his hands on my shoulders
> forcing me to sit down on his man-bug.

*Id.* at 9a.   Child testified that her mom worked at night and she was home with Appellant and her brother.  *Id.* at 10a.   Appellant would carry Child from her bedroom into the back bedroom.  *Id.*

> [The Commonwealth]: . . . What happened in the back
> bedroom?
>
> [Child]: He would tell me to get undressed.  He was
> getting undressed, and he told me to get undressed.  He
> told me to lay down on my back, so I did.  Then he would
> lay down over top of me with his belly facing me.  And he
> would lay down on me, and his man-bug would go into my
> lady-bug.
>
> \* \* \*
>
> Q: What would happen when he did that?
>
> A: He would have my mouth covered, so I couldn't scream
> out loud.
>
> Q: With what?
>
> A: His hand.
>
> Q: Did you want to scream out loud?
>
> A: Yes.  And I was trying to.
>
> Q: . . . What would he do when he would be on top of you
> like that?
>
> A: He would move up and down.

Q: And you said his man-bug was in your lady-bug?

A: Yes.

Q: And do you remember was it actually inside you?

A: Yes.

Q: And you said he would move up and down?

A: Yes.

Q: And your lady-bug, where on you is your lady-bug?

A: My front private.

Q: And what about you said man-bug, where is a man-bug?

A: On a man's front private.

Q: [W]hat did that feel like when he would have it inside your lady-bug?

A: It would hurt.

Q: And you said you tried to scream?

A: Yes.

*    *    *

Q: Could you tell him to stop or anything like that?

A: He had my mouth covered, so I couldn't.

Q: Do you remember how many times this happened in the back bedroom?

A: Twice.

*Id.* at 10a-11a.

On October 20, 2015, the jury found Appellant guilty. On January 13, 2016, Appellant was sentenced to an aggregate term of eighteen to forty years' imprisonment. Appellant filed a post-sentence motion, which was denied. This timely appeal followed. Appellant filed a court-ordered Pa.R.A.P. 1925(b) statement of errors complained of on appeal, and the trial court filed a responsive opinion.

Appellant raises the following issues for our review:

> A. The Commonwealth failed to present sufficient evidence to support a conviction for the offenses of rape, statutory sexual assault, aggravated indecent assault and incest when the Commonwealth's sole witness failed to offer consistent testimony regarding what occurred, when it occurred, how many times it occurred, whether it actually occurred at all, testified she knows it occurred despite sleeping through it because her underwear was inside out and demonstrated she does not understand the meaning of penetration.
>
> B. The Commonwealth failed to present sufficient evidence to support the trial court's holding that Appellant should be classified as a sexually violent predator.
>
> C. The Commonwealth failed to present sufficient evidence to support a conviction for the offense of unlawful restraint of a minor in accordance with 18 Pa.C.S.A. § 2902(c)(1) by failing to offer any evidence that Appellant placed [Child] in actual danger of a substantial risk of death or serious bodily injury.
>
> D. The trial court erred by denying Appellant's motion for mistrial due to the attorney for the Commonwealth's statements during opening remarks revealing inadmissible evidence to the jury which in turn deprived Appellant of a fair trial by preventing the jury from weighing and rendering a true verdict.

E. The trial court erred in permitting the Commonwealth to admit [Child's] prior recorded interview as substantive evidence in accordance with 42 Pa.C.S.A. § 5985.1.

Appellant's Brief at 5.

First, Appellant contends that:

the Commonwealth failed to present sufficient evidence to support a conviction for the offenses of rape, statutory sexual assault, aggravated indecent assault and incest when the Commonwealth's sole witness failed to offer **consistent testimony** regarding what occurred, when it occurred, how many times it occurred, whether it actually occurred at all, testified she knows it occurred despite sleeping through it because her underwear was inside out and demonstrated she does not understand the meaning of penetration.

\*   \*   \*

The **inconsistencies** within [Child's] trial testimony and her previous testimony are too numerous to detail in full without a reading of the entire record.  However, there are key points necessary to support a conviction that simply were not present in the Commonwealth's case due to [Child's] **inconsistent** and therefore, **unreliable testimony**.

*Id.* at 11-12.

Our review of a sufficiency of the evidence is governed by the following

principles:

[O]ur scope of review is plenary.  Our standard of review is *de novo*.  Scope of review refers to the confines within which an appellate court must conduct its examination. . . .  In other words, it refers to the matters (or what) the appellate court is allowed to examine.  In contrast, standard of review refers to the manner in which (or 'how') that examination is conducted.  A standard of review is the degree of deference given by the reviewing court to the decision under review.  In other words, it is the power of

the lens through which the appellate court looks at the issue in a particular case.

[T]he critical inquiry on review of the sufficiency of the evidence to support a criminal conviction . . . does not require a court to ask itself whether it believes that the evidence at the trial established guilt beyond a reasonable doubt. Instead, it must determine simply whether the evidence believed by the fact-finder was sufficient to support the verdict. [A]ll of the evidence and any inferences drawn therefrom must be viewed in the light most favorable to the Commonwealth as the verdict winner.

*Commonwealth v. Ratsamy*, 934 A.2d 1233, 1235-36 (Pa. 2007) (quotation marks and citations omitted).

As a prefatory matter, we consider whether Appellant has waived this sufficiency of the evidence claim. The issue presented in Appellant's Rule 1925(b) statement is as follows: "The evidence presented at trial by the Commonwealth was insufficient to support a conviction on Count One, Rape, Count Two, Statutory Sexual Assault and Count Three, Aggravated Indecent Assault." Appellant's Pa.R.A.P. 1925(b) Statement, 3/16/16, at 1.

[W]hen challenging the sufficiency of the evidence on appeal, the [a]ppellant's 1925 statement must "specify the element or elements upon which the evidence was insufficient" in order to preserve the issue for appeal. Such specificity is of particular importance in cases where, as here, the [a]ppellant was convicted of multiple crimes each of which contains numerous elements that the Commonwealth must prove beyond a reasonable doubt. Here, [the a]ppellant . . . failed to specify which elements he was challenging in his 1925 statement . . . . While the trial court did address the topic of sufficiency in its opinion, we have held that this is "of no moment to our analysis because we apply Pa.R.A.P.1925(b) in

- 19 -

> a predictable, uniform fashion, not in a selective manner dependent on an appellee's argument or a trial court's choice to address an unpreserved claim."
>
> ***Commonwealth v. Gibbs***, 981 A.2d 274, 281 (Pa. Super. 2009) [ ].

***Commonwealth v. Garang***, 9 A.3d 237, 244 (Pa. Super. 2010) (some citations omitted).

Analogously, in the instant case, Appellant's 1925(b) statement fails to "specify the element or elements upon which the evidence was insufficient" and failed to specify which convictions he was challenging. ***See id.*** Thus, we could find the issue is waived. ***See id.*** We decline to find waiver on this basis.

We consider whether Appellant raises a sufficiency of the evidence claim but argues the weight of the evidence. Appellant contends that Child's testimony was inconsistent and unreliable. Appellant's Brief at 12. In ***Commonwealth v. DeJesus***, 860 A.2d 102 (Pa. 2004), our Pennsylvania Supreme Court opined:

> The [a]ppellant's claim challenges the weight, not the sufficiency, of the evidence. The weight of the evidence is exclusively for the finder of fact, which is free to believe all, part, or none of the evidence, and to assess the credibility of the witnesses. **Questions concerning inconsistent testimony . . . go to the credibility of the witnesses**. This Court cannot substitute its judgment for that of the jury on issues of credibility.
>
> \* \* \*
>
> As we will not disturb the jury's credibility determinations, this claim fails.

*Id.* at 107 (citations omitted and emphasis added). Analogously, Appellant's claim challenges the weight of the evidence.[12] ***See id.*** We cannot substitute our judgment for that of the jury. ***See id.*** This claim fails. ***See id.***

Next, Appellant avers that the Commonwealth failed to present sufficient evidence to support the trial court's holding that Appellant should be classified as a sexually violent predator ("SVP"). He contends that "the report issued by psychologist C. Townsend Velkoff and the testimony offered by the Commonwealth prior to sentencing on January 13, 2016[,] reveals the Commonwealth failed to meet their burden in several respects." Appellant's Brief at 17. Appellant argues that Velkoff "failed to adequately consider the best evidence available to establish the nature and circumstances of the offense" pursuant to 42 Pa.C.S. § 9795.4. ***Id.*** at 18. He claims Velkoff's testimony ignored the statutory criteria for establishing a mental abnormality. ***Id.*** Velkoff "ignored the definition of predator set forth in 42 Pa.C.S.A. § 9792." ***Id.*** at 19.

> A challenge to a determination of SVP status requires us to view the evidence
>
> > in the light most favorable to the Commonwealth. The reviewing court may not weigh the evidence or substitute its judgment for that of the trial court.

---

[12] We note that Appellant did not raise the issue of the weight of the evidence to support a conviction for rape, statutory sexual assault or aggravated indecent assault in his Rule 1925(b) statement.

> The clear and convincing standard requires evidence that is so clear, direct, weighty and convincing as to enable [the trier of fact] to come to a clear conviction, without hesitancy, of the truth of the precise facts [at] issue.
>
> The scope of review is plenary. [A]n expert's opinion, which is rendered to a reasonable degree of professional certainty, is **itself** evidence.
>
> A challenge to the sufficiency of the evidence to support an SVP designation requires the reviewing court to accept the undiminished record of the case in the light most favorable to the Commonwealth. The reviewing court must examine all of the Commonwealth's evidence without consideration of its admissibility. A successful sufficiency challenge can lead to an outright grant of relief such as a reversal of the SVP designation, whereas a challenge to the admissibility of the expert's opinion and testimony is an evidentiary question which, if successful, can lead to a new SVP hearing.

*Commonwealth v. Prendes*, 97 A.3d 337, 355-56 (Pa. Super.) (citations and quotation marks omitted), *appeal denied*, 105 A.3d 736 (Pa. 2014).

The basis for a determination that an individual is a SVP is statutory. *Id.* at 357.

> Therefore, the salient statutory inquiry for SVP designation:
>
> [I]s identification of the impetus behind the commission of the offense; that is, whether it proceeds from a mental defect/personality disorder or another motivating factor. The answer to that question determines, at least theoretically, the extent to which the offender is likely to reoffend, and [S]ection [9799.24] provides the criteria by which such likelihood may be gauged.
>
> To deem an individual a sexually violent predator, the Commonwealth must first show [the individual] has been

convicted of a sexually violent offense as set forth in [section 9799.14]. . . . ***See also*** 42 Pa.C.S.A. § 9799.12.[13] Secondly, the Commonwealth must show that the individual has a mental abnormality[14] or personality disorder that makes [him] likely to engage in predatory sexually violent offenses. When the Commonwealth meets this burden, the trial court then makes the final determination on the defendant's status as an SVP.

***Id.*** at 357-58 (quotation marks and some citations omitted).

Section 9799.24 provides:

**(b) Assessment.**—Upon receipt from the court of an order for an assessment, a member of the board as designated by the administrative officer of the board shall conduct an assessment of the individual to determine if the individual should be classified as a sexually violent predator. The board shall establish standards for evaluations and for evaluators conducting the assessments. An assessment shall include, but not be limited to, an examination of the following:

(1) Facts of the current offense, including:

(i) Whether the offense involved multiple victims.

(ii) Whether the individual exceeded the means necessary to achieve the offense.

---

[13] An SVP is defined as a person "who, on or after the effective date of this subchapter, is determined to be a sexually violent predator under section 9799.24 (relating to assessments) due to a mental abnormality or personality disorder that makes the individual likely to engage in predatory sexually violent offenses." 42 Pa.C.S. § 9799.12.

[14] Mental abnormality is defined as a "congenital or acquired condition of a person that affects the emotional or volitional capacity of the person in a manner that predisposes that person to the commission of criminal sexual acts to a degree that makes the person a menace to the health and safety of other persons." 42 Pa.C.S. § 9799.12.

(iii) The nature of the sexual contact with the victim.

(iv) Relationship of the individual to the victim.

(v) Age of the victim.

(vi) Whether the offense included a display of unusual cruelty by the individual during the commission of the crime.

(vii) The mental capacity of the victim.

(2) Prior offense history, including:

(i) The individual's prior criminal record.

(ii) Whether the individual completed any prior sentences.

(iii) Whether the individual participated in available programs for sexual offenders.

(3) Characteristics of the individual, including:

(i) Age.

(ii) Use of illegal drugs.

(iii) Any mental illness, mental disability or mental abnormality.

(iv) Behavioral characteristics that contribute to the individual's conduct.

(4) Factors that are supported in a sexual offender assessment field as criteria reasonably related to the risk of reoffense.

42 Pa.C.S. § 9799.24.

In **Commonwealth v. Brooks**, 7 A.3d 852 (Pa. Super. 2010), this

Court opined:

> [W]ith regard to the various assessment factors listed in Section 9795.4,[15] **there is no statutory requirement that all of them or any particular number of them be present or absent in order to support an SVP designation**. The factors are not a check list with each one weighing in some necessary fashion for or against SVP designation. Rather, the presence or absence of one or more factors might simply suggest the presence or absence of one or more particular types of mental abnormalities.
>
> Thus, while the Board is to examine all the factors listed under Section 9795.4, the Commonwealth does not have to show that any certain factor is present or absent in a particular case. Rather, the question for the SVP court is whether the Commonwealth's evidence, including the Board's assessment, shows that the person convicted of a sexually violent offense has a mental abnormality or disorder making that person likely to engage in predatory sexually violent offenses. Having conducted a hearing and considered the evidence presented to it, the court then decides whether a defendant is to be designated an SVP and thus made subject to the registration requirements of 42 Pa.C.S.A. § 9795.1(b)(3).

*Commonwealth v. Feucht*, 955 A.2d 377, 381 (Pa. Super. 2008) (citations omitted). In discussing the absence of certain statutory factors and discussing the facts of other cases, [the a]ppellant is essentially asking this Court to reweigh them. This we cannot do. *See generally*, *Commonwealth v. Meals*, [ ] 912 A.2d 213 ([Pa.] 2006) (holding that this Court erred in reweighing the SVP evidence presented to the trial court; "the Superior Court stepped beyond its authority when it reweighed the evidence, giving more weight to the 'absent'

---

[15] We note that 42 Pa.C.S. § 9795.1 and § 9795.4 expired on December 20, 2012. *See* 42 Pa.C.S. § 9799.41. Section 9799.24 is virtually identical to Section 9795.4.

factors than those found and relied upon by the trial court").

*Id.* at 863 (some citations omitted and emphasis added).

C. Townsend Velkoff, a licensed psychologist, testified at the hearing on January 13, 2016, as to the following. He:

was provided with material from the assessment board investigator that included the Pennsylvania state police incident report and investigative report, the criminal charges and complaint, the affidavit of probable cause, the Lycoming County Child Protective Services record, the Childline report.[16] It included a protection from abuse order, and it also included information about [Appellant's] prior offense from New York State. There was an incident report of that from New York State.

R.R. at 68a. In making a SVP assessment, he considered whether Appellant "display[ed] a personality disorder, a mental abnormality disorder and also whether he has displayed predatory behavior." *Id.* at 69a. He indicated there are fourteen factors that are considered. *Id.*

[I]f an individual has offended a child or has a pattern of offending behavior related to prepubescent children, that's significant with regard to risk for re-offense because the literature is very clear that individuals who display sexual interest in children have a much higher risk of re-offense than those that do not have that interest.

---

[16] The Childline report is referred to by Trooper Tyson Havens of the Pennsylvania State Police. He testified that he had very little information when he interviewed Appellant on August 19, 2014. The information he had "was on the fax from Children & Youth which was basically what the aunt had told the Childline or Children & Youth caller when—I think it's [Mother's] aunt made the initial call." R.R. at 51a.

*Id.* He testified that Appellant molested his prepubescent seven-year-old[17]

daughter. *Id.* The age of the child is related "in a very significant way" to

mental abnormality. *Id.*

> [W]ith regard to finding mental abnormality [he] considered whether [Appellant met] any diagnostic criteria from the Diagnostic and Statistical Manual of Mental Disorders that would document whether he displays or meets diagnostic criteria for one of the paraphilias. And in this case, because he was molesting his daughter for well more than six months, he met diagnostic criteria for pedophilic disorder which support the conclusion that he has a mental abnormality.
>
> \*   \*   \*
>
> [Appellant] does display pedophilic disorder and the mental abnormality aspect of the definition of sexually violent predator, it's assumed then that [he] displays a lifetime condition and that this condition overrode his emotional and volitional control, thus resulting in the offending behavior.
>
> \*   \*   \*
>
> There was evidence of predatory behavior as described in the file material with respect to him waiting until his wife was out of the home before initiating this behavior with his daughter . . . .

*Id.* at 69a-70a.

Appellant had prior criminal offenses, both sexual and non-sexual. *Id.*

at 69a. He had driving offenses and he was charged with forceable

---

[17] We note that the docket indicates the date of the offense was July 1, 2013. Child testified she was six years old when she told her mom what had happened. R.R. at 130a. Child testified on October 19, 2015 that she was eight years old. R.R. at 7a.

touching in New York for fondling his sister-in-law. *Id.* His overall professional opinion was that Appellant met the criteria to be classified as an SVP. *Id.* at 70a. This opinion was rendered within a reasonable degree of professional certainty. *Id.*

Appellant was not using illegal substances. Velkoff considered this fact in the assessment.

> [T]he fact that he wasn't using illegal substances during the commission of these offenses would mean that he's acting from a sober state. In other words, it can't be argued that he was acting impulsively because he was impaired. Instead he was acting impulsively because of some erotic urge. So in terms of my assessment of him based on the file material, I would see the lack of use of illegal substances as slightly more risky.

*Id.* at 75a.

The trial court opined:

> As far as the finding that [Appellant] is a sexually violent predator, such was based on evidence offered by the Commonwealth at a hearing on January 13, 2016, specifically the expert opinion of [Velkoff] who was qualified by the court as an expert in this area. Of special significance to Mr. Velkoff's opinion were the facts that the victim was seven years old, which supported his conclusion that there was a high risk of re-offense, and that the offenses took place over a period of more than six months, which supported a finding of pedophilic disorder, a mental abnormality. He also considered that [Appellant] had a prior conviction involving a sexual offense, and that he displayed predatory and manipulative behavior.

Trial Ct. Op., 3/17/16, at 4-5.

Velcoff considered whether Appellant displayed a personality disorder, a mental abnormality disorder, and also whether he displayed predatory

behavior. **See Prendes**, 97 A.3d at 357-58. He opined that Appellant had a high risk of re-offense. **See id.** He considered the statutory factors. **See** 42 Pa.C.S. §§ 9799.12, 24; **Brooks**, 7 A.3d at 863. Velcoff concluded that Appellant met the criteria to be classified as an SVP. **See** 42 Pa.C.S. § 9799.24; **Brooks**, 7 A.3d at 863. Viewing the evidence in the light most favorable to the Commonwealth, we find the evidence was sufficient to support Appellant's SVP designation. **See Prendes**, 97 A.3d at 355-56.

Third, Appellant contends "the Commonwealth failed to present sufficient evidence to support a conviction for the offense of unlawful restraint of a minor in accordance with 18 Pa.C.S.A. § 2902(c)(1) by failing to offer any evidence that Appellant placed [Child] in actual danger of a substantial risk of death or serious bodily injury." Appellant's Brief at 20.

As noted above, the standard of review for a challenge to the sufficiency of the evidence is *de novo*. **Ratsamy**, 934 A.2d at 1235.

Section 2902(c)(1) of the Crimes Code provides:

> **(c) Unlawful restraint of minor where offender is victim's parent.**—If the victim is a person under 18 years of age, a parent of the victim commits a felony of the second degree if he knowingly:
>
> > (1) restrains another unlawfully in circumstances exposing him to risk of serious bodily injury[.]

18 Pa.C.S. § 2902(c)(1). Serious bodily injury is defined as "[b]odily injury which creates a substantial risk of death or which causes serious, permanent

disfigurement, or protracted loss or impairment of the function of any bodily member or organ." 18 Pa.C.S. § 2301.[18]

The trial court opined:

> The Commonwealth argues that the evidence that [Appellant's] body weight on top of [Child's] body during the intercourse caused [Child] to not be able to breathe and thus exposed her to the risk of suffocation, was sufficient to support the charge. The court agrees. [Child] testified that "I couldn't scream or anything like that when he was on top of me because he was so heavy, and he was going like this on my mouth. And I could barely breathe," and that [Appellant] "would get on top of me and do this, like cover my nose so I can't scream or breathe or anything, then I pass out, and when he did this a little bit later I wake up from him doing this." She also stated in an interview, a videotape of which was shown to the jury, that she couldn't breathe because her father was hurting her, and she couldn't scream because she couldn't breathe. The evidence that [Appellant's] restraint of [Child] with his body weight and by covering her mouth caused her to pass out is clearly sufficient to support a finding that there was an "actual danger of harm."

Trial Ct. Op., 2/22/16, at 2 (citations and footnote omitted).

Appellant exposed Child to the risk of suffocation that creates a substantial risk of death or serious bodily injury. *See* 18 Pa.C.S. § 2902(c)(1). We find the evidence was sufficient to support a conviction for unlawful restraint of a minor. *See* 18 Pa.C.S. § 2902(c)(1); *Ratsamy*, 934 A.2d at 1235.

---

[18] We note that Appellant cites 18 Pa.C.S. § 2602 for the definition of serious bodily injury. Chapter 26 refers to "Crimes Against Unborn Child."

In his fourth issue, Appellant claims the trial court erred in denying his motion for a mistrial due to the Commonwealth's statement during the opening argument that revealed inadmissible evidence to the jury, *viz.*, that Child's mother got a protection from abuse act ("PFA") order against Appellant. Appellant's Brief at 22. Appellant contends that this reference to the PFA "strongly suggests the jurors would conclude a prior court or even a prior jury had already determined Appellant committed these offenses." ***Id.*** at 23.

Our standard of review of a trial court's refusal to grant a request for a mistrial is well established:

> The decision to declare a mistrial is within the sound discretion of the court and will not be reversed absent a flagrant abuse of discretion. A mistrial is an extreme remedy . . . [that] . . . must be granted only when an incident is of such a nature that its unavoidable effect is to deprive defendant of a fair trial. **A trial court may remove taint caused by improper testimony through curative instructions**. Courts must consider all surrounding circumstances before finding that curative instructions were insufficient and the extreme remedy of a mistrial is required. The circumstances which the court must consider include whether the improper remark was intentionally elicited by the Commonwealth, whether the answer was responsive to the question posed, whether the Commonwealth exploited the reference, and whether the curative instruction was appropriate.

***Commonwealth v. Bracey***, 831 A.2d 678, 682-83 (Pa. Super. 2003) (emphasis added and quotation marks and citations omitted).

During opening remarks to the jury, the Commonwealth stated:

Finally, [Child will] tell you that when she had had enough, because it was really bothering her, she went to her mom . . . . She went to her mother while her mother was cooking breakfast, and she said I don't want daddy sleeping with me anymore. Why not? Because daddy is touching me. You'll hear that [Mother] immediately threw [Appellant] out of the house. You'll hear that she got a PFA. [Appellant] eventually was arrested.

Now, you're going to see the interview with Trooper Havens of when [Appellant] was arrested; and you're going to hear he doesn't exactly come out and admit what happened because he can't bring himself to say what he did to his daughter. You're not going to hear the words I did such and such from him.

But you're going to have to listen to the words carefully, and you will realize the words he does say exactly convey that message. Not only those words, but the words that he said to Children & Youth worker Elizabeth Spagnuolo when she called him on the phone to talk to him about the allegations, the words that he said to Sheriff's Deputy Brian Rockwell when he served the PFA to [Appellant], and the words and notes that he left behind for the children after he moved out and they came back to the home that were found by her mother.

Now, more importantly, during the trial today you're going to hear the words of [Child], the eight-year-old little girl. You're going to hear her testimony today, and you're also going to see her testimony from when she was interviewed by a forensic interviewer at the Children's Advocacy Center in Northumberland County right after this happened.

And keep in mind, ladies and gentlemen, this is an eight-year-old testifying. She may not say things in the terms that you and I would because obviously we're using adult terms. I'm just asking you to carefully listen to her, as you will all witnesses; and in the end you will be convinced beyond a reasonable doubt that [Appellant] is guilty. And I'll be coming back and asking you to render that verdict. Thank you.

R.R. at 3a.

The court held an on-the-record sidebar discussion, out of the presence of the jury. Defense counsel objected to the Commonwealth's mention of the PFA and asked for a mistrial. ***Id.*** The court denied the request and stated it would give a curative instruction. ***Id.*** The court gave the following instruction:

> Ladies and gentlemen, during her opening statement [the Commonwealth] mentioned to you that there was a PFA. A PFA is what they call a Protection From Abuse Act. It is a civil proceeding and perhaps has nothing to do with this case directly, and no negative inferences can be taken against [Appellant] as a result of the PFA. And you are instructed that you are to give that no weight other than the fact that it was one of the things in the succession of events that occurred with respect to the actions of [Appellant's] wife.

R.R. at 4a.

Child's mother testified at trial and the Commonwealth did not reference the PFA. The Commonwealth asked Mother what she did after Child made "a complaint concerning what this trial is about[.]" R.R. at 29a.

> [The Commonwealth]: And what did you do when she came to you and told you that?
>
> A: I went and confronted [Appellant].
>
>         *     *     *
>
> I went and confronted him about it, and he tried to deny it at first.
>
> Q: Well, what did you say?

A: I asked him what he had been doing to our daughter. And then he said that he inappropriately touched her, but it wouldn't happen again. I told him to get out, that he was supposed to be her father, not doing those things to her. He was supposed to be protecting her.

Q: Now, subsequently you would have—you would have left the house with the children?

A: I did.

Q: And at some point did you come back when he was no longer staying there?

A: I did.

R.R. at 29a-30a.

The trial court opined:

As it turns out, the Commonwealth did not subsequently introduce any evidence of the PFA, but elicited from [Child's] mother only that she "told him to get out" and that she left the house with the children and returned only after [Appellant] was no longer staying there. Thus, in light of the court's prior instruction to the jury that the statements and arguments of counsel are not evidence, the court believes the jury did not consider the matter at all, let alone give it undue weight. The statement was insignificant in the context of a consideration of all of the evidence, and clearly did not deprive [Appellant] of a fair trial.

Trial Ct. Op., 2/22/16, at 6-7 (footnote and citation omitted).

The trial court gave a curative instruction to the jury that removed any possible taint by the prosecutor's reference to the PFA. *See Bracey*, 831 A.2d at 682-83. We discern no abuse of discretion by the trial court in denying the motion for a mistrial. *See id.*

- 34 -

Lastly, Appellant contends "the trial court erred in permitting the Commonwealth to admit [Child's] prior recorded interview as substantive evidence in accordance with 42 Pa.C.S.A. § 5985.1." Appellant's Brief at 24. Appellant avers that "[t]he statements in question, and [Child's] statements in general, do not possess consistency in repetition and further suggest the mental state of the declarant is that of someone who is incapable of understanding the truth." *Id.* at 26.

On October 14, 2015, the trial court granted the Commonwealth's motion to admit the recorded interview. The trial court opined:

> Here [Child] testified at trial and thus the only issue presented by the motion was whether there were sufficient indicia of reliability. . . .
>
> The interview was conducted by Sherry Moroz in a room at the Children's Advocacy Center and was videotaped, although it appears that [Child] was unaware that she was being taped. Ms. Moroz usually asked rather general questions like, "is someone worried that something has happened with you?", "What kinds of things happened?", "do you remember what happened?", and "tell me about that". And when she did ask a more specific question, such as (in response to [Child] stating "he was touching me"), "who was touching you?", she never suggested an answer. While the statements were not spontaneous in the sense of being blurted out for no apparent reason, they were given in response to such vague prompts that the court finds spontaneity sufficient to support reliability.
>
> [Child] was consistent in repetition. . . . While she stated at other times, in court hearing, that more things happened than she talked about in the interview, at that interview she told Ms. Moroz that she knew other things had happened but could not remember what they were. Her statement was thus consistent with even other statements given subsequently.

- 35 -

[Child's] mental state during the interview was calm; her demeanor was very matter-of-fact and she was not emotional. While she expressed hesitation to say certain things out loud or at all, preferring to write them down (the word "sex" and two "swear words"), this did not seem to upset her. She described other events (which have been described by others and thus provide a basis to conclude they are accurate) with clarity and accuracy and thus indicated that her mental state was clear and unaffected.

[Child] used terms expected to be used by children her age, such as "ladybug" and "manbug" rather than correct anatomical terms. This suggests that she was describing the events in her own words and that she had not been coached.

Finally, there was no evidence of any motive to fabricate.

Therefore, the court believes it correctly admitted the interview as substantive evidence under section 5985.1, and [Appellant] is not entitled to a new trial on that basis.

Trial Ct. Op., 2/22/16, at 8-9.

Our review is governed by the following principles:

An appellate court's standard of review of a trial court's evidentiary rulings, including rulings on the admission of hearsay and determinations of witness competency, is abuse of discretion. However, issues of statutory interpretation are questions of law, over which our standard of review is de novo and our scope of review is plenary.

*Commonwealth v. Walter*, 93 A.3d 442, 449 (Pa. Super. 2014) (citations omitted).[19]

---

[19] We note that the Pennsylvania Supreme Court in *Walter*

Section 5985.1 provides:

> **(a) General rule.**—An out-of-court statement made by a child victim or witness, who at the time the statement was made was 12 years of age or younger, describing any of the offenses enumerated in 18 Pa.C.S. Chs. 25 (relating to criminal homicide), 27 (relating to assault), 29 (relating to kidnapping), 31 (relating to sexual offenses), 35 (relating to burglary and other criminal intrusion) and 37 (relating to robbery), not otherwise admissible by statute or rule of evidence, is admissible in evidence in any criminal or civil proceeding if:
>
> > (1) the court finds, in an in camera hearing, that the evidence is relevant and that the time, content and circumstances of the statement provide sufficient indicia of reliability; and
> >
> > (2) the child either:
> >
> > > (i) testifies at the proceeding; or
> > >
> > > (ii) is unavailable as a witness.

---

> Consider[ed] whether the Superior Court erred in holding the trial court was required to determine that the child victim was competent to testify under Pa.R.E. 601 prior to admitting her out-of-court statements into evidence pursuant to the Tender Years Hearsay Act ("TYHA"), 42 Pa.C.S.A. § 5985.1. We hold that a determination of a child's competency pursuant to Rule 601 is not a prerequisite to the admission of hearsay statements under the TYHA, and, therefore, we reverse the decision of the Superior Court and remand for further proceedings.

*Id.* at 444-45. We note that in the case *sub juice* there was a competency hearing. **See** R.R. at 205a-224a.

42 Pa.C.S. § 5985.1(a)(1)-(2)(i-ii).

The ***Walter*** Court opined:

> the TYHA concerns the admissibility of out-of-court statements made by a child victim or witness to third parties. The admissibility of this type of hearsay is determined by assessing the particularized guarantees of trustworthiness surrounding the circumstances under which the statements were uttered to the person who is testifying. To determine whether a child's out-of-court statements are admissible under the TYHA,
>
>> a trial court must assess the relevancy of the statements and their reliability in accordance with the test enunciated in ***Idaho v. Wright***, [497 U.S. 805 (1990)]. Although the test is not exclusive, **the most obvious factors to be considered include the spontaneity of the statements, consistency in repetition, the mental state of the declarant, use of terms unexpected in children of that age and the lack of a motive to fabricate.**

***Walter***, 93 A.3d at 451 (quotation marks and some citations omitted and emphasis added). "The tender years statute creates an exception to the hearsay rule in recognition of the fragile nature of young victims of sexual abuse." ***Commonwealth v. Curley***, 910 A.2d 692, 697 (Pa. Super. 2006) (quotation marks and citation omitted).

In the case *sub judice*, Child testified at trial. Therefore, as the trial court found, the only issue was whether the ***Walter*** test was satisfied. The record substantiates the trial court's findings of sufficient spontaneity, Child was consistent in repetition, her mental state was calm, Child used terms expected of children her age, and there was no evidence of a motive to

fabricate. We discern no abuse of discretion or error of law. ***See Walter***,

93 A.3d at 449; ***Curley***, 910 A.2d at 697.

For all of the foregoing reasons, we affirm the judgment of sentence.

Judgment of sentence affirmed.

Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 9/15/2016