J-A03017-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| KAHLIL N. MUHAMMID | : | |
| | : | |
| Appellant | : | No. 295 EDA 2025 |

Appeal from the Judgment of Sentence Entered October 24, 2024
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0001586-2022

BEFORE:   BOWES, J., McLAUGHLIN, J., and FORD ELLIOTT, P.J.E.[*]

MEMORANDUM BY McLAUGHLIN, J.:                **FILED MAY 5, 2026**

Kahlil N. Muhammid appeals from the judgment of sentence entered for his convictions for corruption of minors, rape of a child, involuntary deviate sexual intercourse with a child ("IDSI"), and unlawful contact with a minor.[1] He challenges the sufficiency of the evidence and the denial of his motions for a mistrial. We affirm.

The Commonwealth charged Muhammid with rape of a child and other related crimes for his contact with two complainants, K.W. and K.L., and he proceeded to a jury trial. During *voir dire*, the court explained to the

---

[*] Retired Senior Judge assigned to the Superior Court.

[1] 18 Pa.C.S.A. §§ 6301(a)(1)(ii), 3121(c), 3123(b), and 6318(a)(1), respectively.

prospective jurors that the case involved two complainants who alleged that Muhammid had sexually abused them:

> THE COURT: At this point in time, the allegations in the case are as follows. Understand, these are nothing more than allegations. It is alleged that between the time of 2014 and 2017 that the defendant had unlawful sexual contact with a minor with the initials KW. It is also alleged between the years of 2019 and 2020 that the defendant had unlawful sexual contact with the minor with the initials KL. At this point in time this has resulted in the following charges: For the first case ending in indictment 1586, corruption of minors, rape of a child, involuntary deviate sexual intercourse with a child, and unlawful contact with a minor.
>
> On the other indictment ending in 1587, corruption of minors, rape of a child, involuntary deviate sexual intercourse with a child, and unlawful contact with a minor. My first question is has anybody heard anything about these allegations prior to today; if so, please raise your number.
>
> THE COURT CRIER: No response, Your Honor.
>
> THE COURT: My second question to you is if there's anything about the nature of the allegations and the charges or the charges in [and] of themselves that would prevent you from being an impartial juror in this matter, please raise your number now.
>
> THE COURT CRIER: No. 7, 12, 28, 23, 28, 32, 17, 46, 47, 48, 50, 51, 54, 57, 58.

N.T., 10/10/23, at 17-18. The same day, the court finalized the list of assigned jurors. *Id.* at 26.

The following day, after a hearing regarding K.L.'s competency to testify, the court determined that she was not competent to testify. *See* N.T., 10/11/23, at 15-44. The Commonwealth therefore *nolle prossed* the charges related to K.L.'s allegations. *Id.* at 59. Defense counsel then asked the court

to select a new jury, arguing that it was tainted by hearing that there were two separate complainants and sets of allegations. *Id.* at 60. The court denied the request, finding that the jury was not tainted and that a curative instruction would eliminate any potential prejudice. *Id.* Defense counsel asked the court to "put a pause" on the curative instruction, stating, " I don't know if we want to bring more attention to it." *Id.* at 61. The court agreed and said that counsel could request a curative instruction at "a closing charge." *Id.*

At trial, the Commonwealth presented testimony from K.W., K.W.'s mother and stepmother, and the assigned detective. The court summarized the facts presented at trial as follows:

> During K.W.'s early years, her biological mother [H.W.] regularly used drugs, and [Muhammid] became a part of K.W.'s life. She referred to [Muhammid] as "Uncle Lil." K.W. recalled when she was six years old, while residing with her biological mother in the city and county of Philadelphia, K.W. was awakened by [Muhammid] when he entered her bedroom and pulled down her pants and grabbed her buttocks. N.T. 10/11/23. at 111-114, 116-118, 154. K.W. explained she did not report the abuse at the time because she believed her biological mother did not have the ability or desire to protect her, and as K.W. explained, "it was just going to get worse." Id. at 121 ¶¶ 3-4.
>
> When she was still six, K. W. and her mother moved to Upper Darby, in Delaware County, Pennsylvania. [Muhammid] was present at the new residence. One day, [Muhammid] asked K. W. to leave her mother's bed and enter the bathroom with him. K.W. complied. [Muhammid] then locked the door behind them, pulled her pants down, bent her over and inserted his tongue into her vagina. Id. at 121-125. 128. [Muhammid] commanded K.W. to be quiet so that no one, not even K.W.'s biological mother, would come to her aid. Id., at 125 ,¶7 ¶9. The incident only ended when pieces of toilet paper located on K.W.'s vagina began

collecting on [Muhammid's] tongue, prompting him to stop. Once again, K.W. did not report the abuse due to her belief that her biological mother would or could not protect her. K.W. also feared [Muhammid] would become more aggressive in his abuse.

Around the age of six or seven, K. W. began living with her father, but on occasion she would visit her biological mother, who had moved back to Philadelphia County. Id., at 126-128, 130-131 152. K.W.'s biological mother continued to allow [Muhammid] to have contact with K.W. during the visits. On one occasion, when K.W. was seven years old, she was sleeping when [Muhammid] entered the room. He pulled K.W[.]'s pants down, digitally penetrated her vagina, and then penetrated her vagina with his penis. [Muhammid] then had K.W. perform oral sex on him, and he performed oral sex on K.W. by placing his tongue inside her vagina. Once again, in order to allow the abuse of K.W. to continue without interruption, [Muhammid] instructed her, "shh ... don't tell nobody." Id. at 132, 135 ¶13, 136 ¶1, 137. The assault ended only due to K.W. biting [Muhammid's] penis. Id. at 131-136.

K.W. recalled two (2) other incidents of abuse at the hands of [Muhammid]. When K.W. was still seven years old, sleeping in her mother's bed, [Muhammid] pulled K.W.'s pants down and inserted his tongue inside her vagina. When K.W. was nine years old, again while visiting her biological mother, K.W. was going to sleep when [Muhammid] entered the room, took K.W.'s pants off and penetrated her vagina with his penis. This time, in order to allow the abuse to occur without interruption, [Muhammid] covered K.W.'s mouth with his hand, preventing her from calling out for help. Id., at 138-142, 162, 168.

When K.W. was thirteen years old, she finally disclosed the abuse to her stepmother, [M.S.]. Id., at 143-148, 158-161.

[M.S.] is K.W.'s stepmother. K.W. was approximately seven years old when [M.S.] came into the young girl's life. At the age of thirteen, K.W. decided to disclose to [M.S.] the sexual abuse by [Muhammid]. Id. at 163-164, 166-172, 180-183. In response, [M.S.] took K.W. to doctors for

examinations, and subsequently the abuse was reported to the authorities. Id. at 143-148, 158-161.

[H.W.] is K.W.'s biological mother. [H.W.] admitted that during the years K.W. was being abused by [Muhammid], she was a heavy drug user. [Muhammid], who was a childhood friend of [H.W.], resided with her and K.W. from time to time. [H.W.] allowed [Muhammid] to babysit K.W. on occasion. N.T. 10/12/23. at 16-21, 23-24.

Detective Costello of the Special Victims Unit of the Philadelphia Police Department became assigned to the investigation of [Muhammid] after the matter was referred to city officials by the Delaware County Department of Human Services. As part of her investigation, Detective Costello interviewed both K.W.'s mother and stepmother. Based on her investigation, Detective Costello applied for an arrest warrant, which was approved by the Philadelphia District Attorney's Office. Id. at 34-36, 39, 41, 45-46.

K.W.'s forensic interview was published to the jury. Id. at 47-49. K.W.'s forensic interview corroborated her in-court testimony.

Trial Ct. Op., filed 2/27/25, at 2-5 (footnote omitted).

On the morning of the third day of trial, defense counsel re-raised the issue of the court having summarized the case as involving allegations of crimes against two victims. N.T, 10/12/23, at 10. Counsel argued that any curative instruction would be inadequate and a new jury was required. *Id.* at 11. The court declined to impanel a new jury because it found no prejudice. *Id.* at 12.

During closing arguments, the Commonwealth told the jury, "[W]ith your verdict, you can tell [K.W.] that that burden that she's been carrying on her shoulders since she was 5 years old is gone. Do that. And do that because you know he's guilty." *Id.* at 101. After closing arguments, the court

- 5 -

instructed the jury that it did not have to accept the arguments of either party. It explained, "It is for you and you alone to decide the case based on the evidence as it was presented from the witness stand and in accordance with the instructions I'm giving you now." *Id.* at 109. Muhammid objected to the Commonwealth's closing and moved for a mistrial, arguing that the Commonwealth had improperly asked the jury to send a message. The court denied the request and explained that the standard jury instructions cured any prejudice. *See id.* at 126-27.

The jury found Muhammid guilty of corruption of minors, rape of a child, IDSI, and unlawful contact with a minor. The court sentenced him to an aggregate term of 20 to 40 years' incarceration. Muhammid filed a post-sentence motion, which the court denied. This timely appeal followed.

Muhammid raises the following issues:

I.  Whether the trial court erred in finding sufficient evidence that [Muhammid] committed unlawful contact with a minor where [Muhammid] did not engage in any contact or communications as defined in *Commonwealth v. Strunk*, 325 A.3d 530 (Pa. 2024), given that [Muhammid] did not say or do anything to facilitate the alleged unlawful sex acts.

II.  Did the trial court err in denying mistrial motion after finding one of the complainants incompetent to testify given that the jury had been informed during jury selection that there were two complainants, two indictments, and separate charges for each complainant, and the actual trial had not yet begun at the time of the request.

III.  Whether the trial court should have granted a mistrial in response to the prosecution's arguments which focused on reducing the burden of proof, disparaging

> defense counsel, and eliciting sympathy for the complainant by asking the jury remove the burden from her shoulders rather than to focus on the evidence and determine whether the Commonwealth proved guilt beyond a reasonable doubt.

Muhammid's Br. at 5 (suggested answers omitted).

Muhammid first maintains that there was insufficient evidence to support his conviction for unlawful contact with a minor. He argues that the instances of him shushing the victim or placing his hand over her mouth do not meet the definition of "contact." He points out that the victim did not testify that Muhammid said anything sexual to her during the assault. *See id.* at 15. He claims that even if the evidence was sufficient for the crimes of rape and IDSI, "it is insufficient for unlawful contact because unlawful contact requires some sort of grooming-type prior communication to facilitate the sexual assault." *Id.* at 26. Muhammid also claims that ***Strunk*** is dispositive. Muhammid argues that like the defendant's actions in ***Strunk***, his actions here did not qualify as contact under Section 6318 because it did not amount "to communication necessary to facilitate the commission of the assaults." *Id.* at 27.

Our standard of review for a challenge to the sufficiency of evidence is settled:

> The standard we apply in reviewing the sufficiency of the evidence is whether viewing all the evidence admitted at trial in the light most favorable to the verdict winner, there is sufficient evidence to enable the fact-finder to find every element of the crime beyond a reasonable doubt. In applying [the above] test, we may not weigh the evidence and substitute our judgment for the fact-finder. In addition,

we note that the facts and circumstances established by the Commonwealth need not preclude every possibility of innocence. Any doubts regarding a defendant's guilt may be resolved by the fact-finder unless the evidence is so weak and inconclusive that as a matter of law no probability of fact may be drawn from the combined circumstances. The Commonwealth may sustain its burden of proving every element of the crime beyond a reasonable doubt by means of wholly circumstantial evidence. Moreover, in applying the above test, the entire record must be evaluated and all evidence actually received must be considered. Finally, the [trier] of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence.

*Commonwealth v. Chisebwe*, 278 A.3d 354, 358 (Pa.Super. 2022) (citation omitted).

The crime of unlawful contact with a minor is "intended to criminalize and punish communication designed to induce or otherwise further the sexual exploitation of children." *Strunk*, 325 A.3d at 543. This crime occurs when a "person is intentionally in contact with a minor, . . . for the purpose of engaging in an activity prohibited under" enumerated provisions of the Crimes Code, including corruption of minors, rape of a child, and IDSI. 18 Pa.C.S.A. §§ 6318(a)(1.2), (4.2). The contact may be verbal or non-verbal. *See Commonwealth v. Davis*, 225 A.3d 582, 587 (Pa.Super. 2019); 18 Pa.C.S.A. § 6318(c) (**"Contacts."**).

In *Strunk*, our Supreme Court addressed whether "contact" in Section 6318 included non-communicative conduct. 325 A.3d at 531. At Strunk's trial, the victim testified about three separate sexual assaults committed by Strunk. During one of the assaults, Strunk whispered something to the victim, but she

did not remember what he said and denied that it was a threat. Although the victim testified that Strunk had "manipulated" her clothing, she stated that he did not communicate with her, either verbally or non-verbally while doing so. Our Supreme Court concluded that the evidence was insufficient. It determined that Section 6318 had a "communicative focus" and was "intended to criminalize communicative behavior not otherwise covered by the Crimes Code." *Id.* at 531, 542. It explained:

> Section 6318 does not criminalize inappropriate touching of minors; other statutes accomplish that goal. Section 6318 is perhaps best described as an anti-grooming statute. But even that description is imperfect. Any communication that is intended to further the commission of one of the crimes listed in Section 6318(a), whether it fits the definition of grooming or not, falls within the prohibition.

*Id.* at 542. As it determined that the evidence there did not "establish that Strunk communicated with the victim to facilitate his assaults," it vacated the unlawful contact conviction. *Id.* at 543.

Here, the trial court concluded that the evidence was sufficient. It determined that Muhammid's "conduct fits squarely within the 'contact' as defined by our Supreme Court in *Strunk*." Trial Ct. Op. at 13. The court found that Muhammid's shushing of the victim, instructing her not to tell anyone, and placing his hand over her mouth during the assaults amounted to "contact." The court found it was irrelevant whether Muhammid's contact occurred before the assaults, and concluded that the jury could have reasonably inferred that the contact was "done with the intent to further the

commission of the sexual offenses for which he was on trial." *Id.* at 14. We agree.

**Strunk** affords Muhammid no relief. Here, unlike in **Strunk**, there was evidence establishing that Muhammid communicated both verbally and non-verbally with the victim to facilitate his assaults. He verbally communicated with the victim during one of the assaults by telling her to "shh" and instructing her not to tell anyone. During another assault, he communicated non-verbally with the victim by placing his hand over her mouth. The evidence was sufficient to prove that he engaged in communicative conduct intended to further the commission of an enumerated crime.

Next, Muhammid claims that the trial court erred in denying his motion to empanel a new jury after the Commonwealth *nolle prossed* the charges related to K.L. He asserts that the court denied this motion to save time. He also states that he declined the court's offer for a cautionary instruction because it would not cure the prejudice and "it would have highlighted the error and made things worse." Muhammid's Br. at 30. He asserts that the evidence "was improper Rule 404(b) evidence which came from the trial judge instead of the Commonwealth or a witness." *Id.* at 31.

"The process of selecting a jury is committed to the sound discretion of the trial judge and will be reversed only where the record indicates an abuse of discretion[.]" **Commonwealth v. Noel**, 104 A.3d 1156, 1169 (Pa. 2014). "The purpose of *voir dire* is to ensure the empaneling of a fair and impartial jury capable of following the instructions on the law as provided by the trial

court." *Id.* at 1168 (citation omitted). The appellant bears the burden of showing that the jury was not impartial. *Id.* at 1169.

> Every unwise or irrelevant remark made in the course of a trial by a judge, witness, or counsel does not compel the grant of a new trial. Rather, the focus is on what if any effects the comments had on the jury. A new trial is required when the effect would be to prejudice the jury, forming in their minds fixed bias and hostility towards the defendant so that they could not weigh the evidence objectively and render a true verdict.

*Commonwealth v. Van Horn*, 797 A.2d 983, 989 (Pa.Super. 2002) (cleaned up).

Here, we discern no abuse of discretion. Muhammid argues by analogy to Pa.R.E. 404(b). The analogy is not apt. Rule 404(b) applies only to evidence that a party seeks to admit at trial. In contrast, the court's challenged statements during *voir dire* were not admitted as evidence. Rather, the court gave the summary of the charges as part of the efforts during *voir dire* to ensure an impartial jury. *See* N.T., 10/10/23, at 18 (asking jurors if nature of allegations or charges would prevent them from serving impartially). Additionally, we perceive no prejudice. The court did not describe the factual underpinnings of the charges, and the charges against Muhammid as to each victim were the same. Most notably, the court cautioned the jury to consider the summary as "nothing more than allegations." *Id.* at 17. We presume that the jury abided by that direction. *See Commonwealth v. Rodriguez*, 340 A.3d 334, 346 (Pa.Super. 2025) (stating that jury is presumed to have followed court's instructions). In this context, the court's summary did not rise

to the level of creating a fixed bias in the jurors' minds. Muhammid's claim is meritless.

In his final claim, Muhammid alleges that the Commonwealth improperly told the jury to send a message to the community or the victim by urging it to think of the case as a "conversation" and use the verdict to tell the victim that the "burden that she's been carrying on her shoulders since she was 5 years old is gone." N.T. 10/12/23, at 87-88, 101. He maintains that the denial of his motion for a mistrial was not harmless error because the Commonwealth's case rested on the victim's testimony, which he describes as uncorroborated and inconsistent.

Granting or denying a motion for mistrial is within the trial court's discretion. **Commonwealth v. Cox**, 231 A.3d 1011, 1018 (Pa.Super. 2020). We review a challenge to the denial of a motion for mistrial for an abuse of discretion. **See id.**

"A prosecutor's remarks do not constitute reversible error unless their unavoidable effect would prejudice the jury, forming in their minds fixed bias and hostility toward the defendant so that they could not weigh the evidence objectively and render a true verdict." **Commonwealth v. Sneed**, 45 A.3d 1096, 1110 (Pa. 2012); **see also Van Horn**, 797 A.2d at 989. While a prosecutor may use oratorical flair during argument, "prosecutorial statements urging a criminal jury to 'send a message' to the community or the criminal justice system" are improper. **Commonwealth v. Patton**, 985 A.2d 1283, 1287 (Pa. 2009). Thus, in a capital case, a prosecutor's argument

- 12 -

during the penalty phase that the jury should "send a message" with a death verdict is *per se* prejudicial. **Id.** at 1287-88 (citing **Commonwealth v. DeJesus**, 860 A.2d 102 (Pa. 2004)). In contrast, the prosecutor's arguments in **Patton**, which was a non-capital case, to send a message to the defendant that "he can't get away with murder," and to a cooperating witness that he "did the right thing" by coming forward, did not require a new trial. **Id.** at 1288-89.

Here, the trial court properly exercised its discretion in denying Muhammid's motion for a new trial. The contested statement from the Commonwealth is like the remarks made by the prosecutor in **Patton**. The Commonwealth argued here for a message to the victim, rather than the community or the criminal justice system. **See id.** at 1287. Furthermore, the full context of the Commonwealth's argument reveals that after the contested statement, the prosecutor told the jury, "And do that **because you know he's guilty**." N.T., 10/12/23, at 101 (emphasis added). Thus, the Commonwealth argued that the jury's verdict should be based on its finding Muhammid guilty and not any bias or hostility against him.[2]

Moreover, any prejudice was cured by the trial court's instruction following closing arguments. The court instructed the jury, "You, the jurors, are the sole judges of the facts. It will be your responsibility to consider the

_____

[2] To the extent Muhammid now claims that the prosecution improperly accused him of "gaslighting" and that its arguments had the effect of shifting the burden to the defense, those arguments are waived for failure to raise them below.

- 13 -

evidence to find the facts and apply the law to the facts as you find them to decide whether the defendant has been proven guilty beyond a reasonable doubt." *Id.* at 123. We presume the jury followed these instructions. *Rodriguez*, 340 A.3d at 346.

Judgment of sentence affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 5/5/2026